(214 P.3d 684)
No. 100,028

JACK R. LaPOINTE, *Appellant*, v. STATE OF KANSAS, *Appellee*.

Opinion filed August 28, 2009.

*Richard Ney*, of Ney, Adams & Sylvester, of Wichita, for appellant.

*Steven J. Obermeier*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, for appellee.

Before MALONE, P.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: Jack LaPointe appeals from the trial court's judgment denying his ineffective assistance of counsel claims in his K.S.A.

60-1507 motion without holding an evidentiary hearing. LaPointe argues that the trial court erred in failing to hold an evidentiary hearing on the following claims: (1) that his trial counsel was ineffective in failing to object to testimony concerning the reliability of eyewitness identification given by the lead detective in the case; (2) that his trial counsel was ineffective in failing to file a notice of alibi with the correct address of the main alibi witness; (3) that his trial counsel was ineffective in failing to request further DNA testing; and (4) that his trial counsel was ineffective in failing to object to prosecutorial misconduct. As to LaPointe's first three ineffective assistance of counsel claims, we determine that factual issues exist as to whether the conduct by LaPointe's trial counsel was deficient and whether LaPointe was prejudiced by this conduct. As a result, we reverse and remand for an evidentiary hearing on those claims. As to LaPointe's fourth claim of ineffective assistance of counsel, however, we determine that there is not a substantial issue as to whether LaPointe's trial counsel was ineffective. As a result, we affirm the trial court's decision on this ineffective assistance of counsel claim.

In addition, LaPointe appeals from the trial court's denial of his request for production of hairs and clothing for DNA testing as discovery evidence in the K.S.A. 60-1507 proceeding. LaPointe raises the following two arguments as to why the trial court's decision on this issue was erroneous: (1) that under the civil discovery statutes, specifically K.S.A. 60-234(a), he was entitled to production of the hairs and clothing for DNA testing; and (2) that he had a due process right to access potentially exculpatory evidence. Nevertheless, we determine that the discovery rules are inapplicable in a K.S.A. 60-1507 hearing. Moreover, based on the current procedural posture of this case, we determine that the question of whether LaPointe had a due process right to access the hair and clothing for DNA testing is not properly before this court. In the event that the trial court finds on remand that LaPointe's trial counsel was deficient in not requesting further DNA testing, then the court should consider whether LaPointe is entitled to obtain the hair and clothing for DNA testing. Accordingly, we affirm in part, reverse in part, and remand.

## Underlying Criminal Case

In his underlying criminal case, LaPointe was found guilty by a jury of aggravated robbery and aggravated assault. LaPointe's convictions were based upon a robbery of a Payless Shoe Source (Payless), which was located in a strip mall in Roeland Park, that occurred on October 30, 2000.

## The Robbery

Around 8 p.m. on October 30, 2000, Carrie Wellman was checking out customers at the Payless store when a man walked in with a gun and proceeded to rob the store. Monica Ortiz was shopping in the Payless store with her three children and was completing her purchase when the robber walked in the store. The robber pointed the gun in Ortiz' face and instructed her not to look at him. The robber also pushed Ortiz' 5-year-old daughter to the ground when she tried to run to her mother. After Wellman gave the robber approximately $1,000 in a plastic shopping bag, he ran from the store. Wellman then called the police.

Carrie Delaney and Brandy Loveall had been shopping at a store in the strip mall and were driving out of the parking lot when Loveall spotted a man carrying a gun and walking fast on the sidewalk. Loveall made eye contact with the man before he passed her and ran between two buildings. According to Loveall, Delaney was driving the car when Loveall saw the man.

When the police arrived at the scene, several officers went to a nearby apartment complex after learning that the robbery suspect had been seen there. Upon arriving at the apartment complex, Officer Eric Thompson saw a woman in the parking lot holding cash in her hand. The woman told Thompson that a Caucasian man had just run through the breezeway and had dropped the money on his way up the stairs. Thompson took the money, which was $138, from the woman and asked her to remain there. Thompson ran through the breezeway to look for the robber but was unable to find him. When Thompson returned to his patrol car, the woman was no longer there.

During their search of the apartment complex area, officers found a plaid shirt and hat in a breezeway and a pair of cloth gloves

in the front of one of the buildings. In addition, a police dog that had been brought to the apartment complex to track the suspect's scent pulled a blue and white bandana from underneath a car parked at the complex.

*Eyewitnesses' Description of Suspect.*

Detective Karen Borstelman interviewed Loveall on November 1, 2000, and completed a composite sketch of the man she saw carrying a gun on the evening of October 30, 2000. Loveall described the man as Caucasian and standing approximately 6 feet tall, wearing a blue and white bandana on his head, with blond hair sticking out from underneath the bandana. The man was wearing a blue and white flannel shirt and was carrying a double-barreled sawed-off shotgun. Loveall further described the man as being in his early 30's and having a slender build. By the time of trial, Loveall had forgotten some of the details she had given Borstelman and described the man she saw as Caucasian and wearing a bandana on his head, wearing a coat, and carrying a gun. Moreover, Loveall could not recall whether the headlights of Delaney's car were illuminating the shadowy area in which the man was walking. Nevertheless, at trial, Loveall identified LaPointe as the man she had seen on the evening of October 30, 2000.

The other witnesses' descriptions of the robber differed somewhat from Loveall's description. According to Wellman, the man was Caucasian, was in his mid- to late-20's, stood about 6 feet tall, wore a plaid jacket and a bandana over part of his face, and had blond spikey hair with dark roots. Ortiz described the robber as a Caucasian man who was in his mid-20's and of slender build. Ortiz testified that the robber was wearing a cap and had put a handkerchief over his face when he came into the store. Ortiz' 11-year-old daughter, Monserrat Santos, described the robber as a Caucasian man with blue eyes and a muscular build. According to Santos, the robber had blond spikey hair, stood about 6 feet tall, had placed a bandana over his nose and mouth shortly after he had entered the store, and had not been wearing a hat.

Delaney was also interviewed by a detective and gave a description of the man, but she was unable to make a composite sketch.

Delaney described the man as Caucasian and standing 5'10" tall, having a skinny build, wearing nothing on his head, wearing a blue flannel-type shirt, and carrying a white plastic trash bag. Delaney did not see the man carrying a weapon. According to Delaney, she was shown a photo lineup but was unable to make a positive identification. Delaney testified that she had suffered a stroke, which had affected her short-term memory, during the first part of October 2000.

During the investigation of the robbery, one of the officers had commented that an individual named Joseph Seeber seemed to match the suspect's description and lived in the apartment complex just north of the Payless store. A photo lineup was then put together with Seeber's picture.

## Wellman's Eyewitness Identification

On November 9, 2000, Detective Scott Atwell showed Wellman the photo lineup. In looking at the photographs, Wellman used her hand to cover up the lower half of each of the faces. After approximately 5 minutes, Wellman identified the suspect in photograph number 1 as the robber. Nevertheless, according to Atwell, Wellman indicated that the person depicted in photograph 1 had a fatter face and longer hair than the robber. At trial, Wellman acknowledged that she was unsure of her pick in the photo lineup. Moreover, Wellman testified that she would not recognize the man who robbed her if she saw him again. The person in photograph 1 was Seeber, the target suspect in that photographic lineup.

## Loveall's Failure to Identify Suspect in First Lineup

On November 15, 2000, Atwell showed the same photo lineup to Loveall. Nevertheless, Loveall immediately stated that all the individuals in the photos were "way too young."

## Atwell's Testimony Concerning Eyewitness Identifications

Despite Wellman's identification of Seeber in the photo lineup, the police did not attempt to contact Seeber to question him about the robbery. When questioned at trial about why he had not investigated Seeber further, Atwell testified that he had "absolutely no confidence in the way" Wellman picked out photograph 1.

Moreover, Atwell explained that he had received a laboratory report stating that Seeber's fingerprints were not those on the latent fingerprint cards collected at the Payless store. Atwell acknowledged, however, that the latent prints did not match LaPointe's fingerprints either. Atwell further testified that he had confidence in Loveall's identification "because she had observed the suspect under no stress whatsoever" and had seen the suspect bare-faced.

### Norton's Interviews With FBI Agents

During November 2000, Michael Norton was taken into FBI custody on suspicion of bank robbery. During his interview, Norton told FBI agents that he had been told by LaPointe that LaPointe had robbed the Payless store in Roeland Park. Norton stated that he believed that LaPointe had used a shotgun during the robbery and had thrown the shotgun on the roof of a nearby building after the robbery.

After Norton pled guilty to federal bank robbery charges, FBI agents interviewed Norton on January 4, 2001, regarding the Payless robbery. During that interview, Norton admitted that he had been involved with LaPointe in the Payless robbery. Norton stated that he had driven LaPointe to the Payless store and had parked at a nearby apartment complex while LaPointe went to commit the robbery using a shotgun. Norton told the FBI agents that when LaPointe had returned to the car, LaPointe said that he had thrown the shotgun onto the roof of the Fashion Bug, which was a store in the same strip mall as the Payless store.

### Recovery of Sawed-off Shotgun

Based on this information, FBI Agent Jeffrey Harris contacted Atwell and then met him in the parking lot of the Fashion Bug. With the fire department's help, a 12-gauge sawed-off shotgun was recovered from the roof of the Fashion Bug.

### Loveall's Identification of LaPointe in Second Photo Lineup

On January 22, 2001, Atwell showed Loveall a second photo lineup with LaPointe's picture in it. According to Atwell, as soon as the photo lineup hit Loveall's hand, she pointed to photo 4 and said "that's the guy." LaPointe was the individual in photograph 4.

The ages of the other individuals depicted in the photo lineup were 21, 21, 20, 19, and 25, while LaPointe was 31. This second photo lineup was never shown to Wellman.

*LaPointe's Trial*

LaPointe went to trial on charges of one count of aggravated robbery and one count of aggravated assault. The State's main evidence against LaPointe at trial was Loveall's identification of LaPointe and Norton's statements and testimony that LaPointe had committed the robbery. Although Norton implicated himself in the Payless robbery during his testimony at trial, he had been given immunity in exchange for his testimony against LaPointe. Norton had not received any reduction in his federal sentence for his cooperation in LaPointe's criminal case.

*Norton's Testimony*

During his testimony at trial, Norton stated that he and LaPointe had known each other since 1998. Moreover, both Norton and LaPointe had worked for Norton's father during 2000.

According to Norton, on October 30, 2000, he and LaPointe had planned to do a robbery in a low-key area that had a quick getaway to the highway. Norton testified that he was supposed to get ¾ of the money that LaPointe got from the robbery because LaPointe owed him money. Once LaPointe decided to rob the Payless store, Norton pulled into the parking lot behind the Fashion Bug to wait for LaPointe.

Norton testified that he brought a sawed-off shotgun that he had obtained from LaPointe. Norton further testified that when LaPointe got out of the car, he took the shotgun and placed it up the sleeve of his sweater. According to Norton, LaPointe was wearing jeans, a pull-over sweater, a ball cap, and a bandana when he got out of the car.

Norton testified that LaPointe came running to the car approximately 15 to 20 minutes later without the gun. LaPointe told Norton that there was a Hispanic woman in the store that was trying to leave, but he had forced her back and told her that no one was leaving. According to Norton, he heard a thump before he saw LaPointe and assumed that LaPointe had probably thrown the gun

in a dumpster or on the roof of a building. When LaPointe returned to the car, he told Norton that he had thrown the gun on the roof of the building.

According to Norton, he dropped LaPointe off at the home of LaPointe's girlfriend, Deanna Burch, about 45 minutes after the robbery. Norton testified that Burch's car was parked outside when he dropped off LaPointe. Nevertheless, Burch testified that she was working at an event at Wal-Mart on October 30, 2000, and did not get home until around 9:30 that night. According to Burch, LaPointe did not have a key to her home, and he was not there when she got home that evening. Norton testified that he later disposed of LaPointe's bandana and gloves in a dumpster at his apartment complex. Norton testified that he has been bald on top of his head since he was 20, and his hair is brown but turns semi-blond with a lot of sunlight.

During his testimony at trial, Norton admitted that he had 10 prior convictions for dishonesty or false statement. His criminal history included several convictions for armed robbery and auto theft, which dated back to when he was a juvenile.

*Seeber's Testimony*

The State called Seeber as a witness at trial. Seeber testified that he was not the individual who had robbed the Payless store with a sawed-off shotgun. Seeber further testified that he did not have a car and did not know Norton or LaPointe. At the time of trial, Seeber was 22 years old, 5'9", and 170 pounds.

*Loretta LaPointe's Testimony*

Loretta LaPointe, who married Jack LaPointe on March 15, 2001, testified that she had seen LaPointe pull a sawed-off shotgun out of the trunk of her car around the beginning of October 2000. Loretta immediately told LaPointe that the gun was not staying there, and she never saw it again. LaPointe told Loretta that he had gotten the shotgun from one of their friends to compensate Norton for a pistol that Loretta had thrown in the river after she had found it in her car.

*Forensic Evidence*

Lila Thompson, a latent print examiner, testified that she was unable to develop any latent prints on the gun that was found on the roof of the Fashion Bug store. Thompson was able to find latent fingerprints on the latent print cards recovered from the Payless store. Thompson compared these latent fingerprints against Seeber's fingerprints, but they did not match. Another latent fingerprint examiner compared the fingerprints on three of the latent print cards with the fingerprints of LaPointe and Norton, but they did not match. He also tested the money recovered from the woman at the apartment complex for fingerprints, but no prints of sufficient value for comparison purposes were obtained.

Sally Lane, a forensic chemist at the Johnson County crime lab, examined the shirt, cap, gloves, and bandana recovered from the apartment complex for DNA evidence. Lane found two hairs on the bandana and additional hairs on the shirt, cap, and gloves. Lane sent the hairs to the Kansas City, Missouri, police crime lab. Lane attempted to obtain additional DNA evidence from the items submitted to her, but she was unable to obtain a sufficient DNA sample.

Robert Booth, the chief criminalist at the Kansas City, Missouri, police crime lab, examined four head hairs and microscopically compared them against LaPointe's hair. Booth compared the hairs with 34 of LaPointe's hairs, which were taken from the top, sides, and front of his head. Booth testified that none of the four head hairs matched LaPointe. According to Booth, his comparison testing did not definitively establish that the head hairs did not come from LaPointe because he had only a representative sample of LaPointe's hair or because LaPointe could have changed his hair since the hairs were deposited. Nevertheless, Booth testified that those two explanations were "rather remote in occurrence" and that the explanation that the hairs were not LaPointe's was "the most likely outcome." Booth did not compare the hairs to any from Seeber or Norton.

*Alibi Evidence*

LaPointe's alibi presented at trial was that he had been at the home of Loretta LaPointe, his girlfriend and later his wife, on the

evening of October 30, 2000. According to LaPointe, he had broken up with Burch by that time and was living with Loretta. Loretta testified that on October 30, 2000, she received a call from work at 7:35 p.m. that she needed to report for the night shift that evening. According to Loretta, she left her home around 9:45 p.m. to work the 10:30 p.m. shift. Loretta testified that she remembered LaPointe being home that evening and eating Halloween candy with her daughter. Loretta further testified that LaPointe was at home from the time she received the call at 7:35 p.m. until she left for work and that he also babysat her children while she was at work.

The State presented rebuttal evidence from Detective Atwell that when he went to Loretta's home on December 18, 2003, she never told him that LaPointe was at home on October 30, 2000. According to Atwell, he served Loretta with a subpoena on March 18, 2004, and asked her then where LaPointe was on the day of the robbery. At that time, Loretta told Atwell that LaPointe had been at home on October 30, 2000, eating Halloween candy with her daughter while she was preparing for work.

### LaPointe's Testimony

LaPointe testified that he did not see Norton on October 30, 2000, and he did not go to the Payless store. LaPointe further testified that he did not commit the armed robbery and aggravated assault. According to LaPointe, he weighed approximately 240 pounds in October 2000 and was 6 feet tall. During Loretta's testimony, a picture was admitted that was taken of LaPointe around October 28, 2000, which showed him having short dark brown hair.

### Conviction and Sentencing

The jury found LaPointe guilty of both the aggravated robbery and aggravated assault charges. LaPointe was sentenced to 245 months in prison with his sentence to run consecutive to his sentences in three other cases. His convictions were affirmed on appeal by this court. See State v. LaPointe, Case No. 93,709, unpublished opinion filed October 13, 2006. Our Supreme Court denied LaPointe's petition for review on February 14, 2007.

*Motion for Postconviction DNA Testing*

In April 2007, LaPointe moved for postconviction DNA testing in his criminal case, but his motion was denied. LaPointe did not appeal the denial of his motion for DNA testing in his criminal case.

*K.S.A. 60-1507 Motion*

In June 2007, LaPointe moved for relief under K.S.A. 60-1507 based on claims of ineffective assistance of counsel. LaPointe argued that his trial counsel was ineffective for the following reasons: (1) failing to request independent DNA testing of hairs found on a bandana and biological material on clothing allegedly worn by the robber; (2) failing to object when Detective Atwell improperly bolstered the identification of LaPointe by Loveall; (3) failing to object when Atwell testified he had no confidence in Wellman's eyewitness identification of Seeber as the perpetrator of the robbery; (4) placing an incorrect address on the notice of alibi, which allowed the State to impeach LaPointe's alibi; (5) failing to object to improper comments by the prosecutor in closing argument; (6) failing to thoroughly investigate the case and interview witnesses; and (7) failing to effectively cross-examine and impeach the State's witnesses.

*Request of Production of Hairs and Clothing for DNA Testing*

In August 2007, LaPointe requested production of the five head hairs and the clothing recovered by officers during the investigation in the underlying criminal case for the purpose of DNA testing. In addition, LaPointe requested that the State produce Norton's DNA profile for the purpose of comparing Norton's profile to the DNA profile obtained from the hairs and clothing. LaPointe cited K.S.A. 60-234(a) and *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), as authority for his request for production. LaPointe asserted that the discovery and testing of the items was necessary to establish his claim that he was denied his right to effective assistance of counsel when his trial counsel failed to have those items subjected to independent DNA testing. LaPointe stated that he would bear the cost of the DNA testing.

On the same date that he filed his request for the production of the hairs, clothing, and DNA evidence, LaPointe also filed a request for an evidentiary hearing on his K.S.A. 60-1507 motion.

The trial court held a nonevidentiary hearing on October 24, 2007. The main focus of the hearing was whether LaPointe should be allowed to obtain the hairs, clothing, and DNA evidence in discovery in the K.S.A. 60-1507 proceeding. The trial court determined that it would take the matter under advisement and gave the parties the opportunity to submit additional briefs on the issue. The trial court noted that at the very least, there would still need to be an evidentiary hearing to delve into the reasonableness of defense counsel's actions in not requesting the DNA testing. The trial court told the parties that after it issued its ruling, they could contact the bailiff and coordinate with each other and get time on the docket.

*Trial Court's Decision*

On November 8, 2007, the trial court issued its memorandum decision denying LaPointe's request for the production of the hairs, clothing, and DNA evidence at that time. The trial court noted that LaPointe must first show that defense counsel was deficient in not ordering DNA testing before trial. The trial court stated that if LaPointe met that initial showing, it might reconsider the question of DNA testing to allow LaPointe to show prejudice as a result of trial counsel's failure to conduct those tests.

On January 22, 2008, the trial court issued a written order denying LaPointe's K.S.A. 60-1507 motion. The trial court noted that it had advised defense counsel that once the trial court issued its opinion on LaPointe's request for production, he should coordinate with opposing counsel and set a date with the bailiff if further hearings were desired. The trial court pointed out that it had filed its decision on November 9, 2007, with a copy sent to the parties, but no future hearing date had been requested. As a result, the trial court determined that it would decide LaPointe's K.S.A. 60-1507 motion on the brief submitted. The trial court found that the motion, files, and records of the case conclusively showed that

LaPointe was not entitled to relief and denied LaPointe's K.S.A. 60-1507 motion without further hearing.

## I. *Ineffective Assistance of Counsel Claims*

### *Standards of Review*

First, LaPointe contends that the trial court erred in denying his K.S.A. 60-1507 motion without an evidentiary hearing. The trial court shall hold an evidentiary hearing on a K.S.A. 60-1507 motion and make findings of fact and conclusions of law with respect thereto, unless the motion, files, and records of the case conclusively show the prisoner is not entitled to relief. K.S.A. 60-1507(b); Supreme Court Rule 183(f) and (j) (2008 Kan. Ct. R. Annot. 247). The burden is on the movant to allege facts sufficient to warrant a hearing on the 60-1507 motion. Supreme Court Rule 183(g); *Swenson v. State*, 284 Kan. 931, 938, 169 P.3d 298 (2007).

When a trial court appoints counsel and holds a preliminary hearing on a K.S.A. 60-1507 motion, an appellate court applies a findings of fact and conclusions of law standard of review. The appellate court determines whether the findings are supported by substantial competent evidence and whether those findings are sufficient to support the trial court's conclusions of law. The appellate court reviews the trial court's ultimate conclusions of law using a de novo standard. *Wilkins v. State*, 286 Kan. 971, 980, 190 P.3d 957 (2008).

To support a claim of ineffective assistance of counsel, a movant must prove (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that the movant suffered prejudice in that, but for counsel's deficient performance, there was a reasonable probability that the result of the proceeding would have been different. *Wilkins*, 286 Kan. at 981.

We bear in mind that judicial scrutiny of trial counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of the challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must strongly presume that coun-

sel's conduct falls within the wide range of reasonable professional assistance. 286 Kan. at 981.

## A. *Failure to Object to Detective Atwell's Testimony*

LaPointe contends that his counsel was ineffective in failing to object to Detective Atwell testifying to the credibility of Brandy Loveall and Carrie Wellman, the two eyewitnesses identifying suspects in the photo lineups.

During Detective Atwell's testimony at trial, the prosecutor questioned Atwell about why he had not interviewed Seeber after Wellman had identified him as the robber. Testifying that he had no confidence in Wellman's identification but he did have confidence in Loveall, Atwell stated:

"I had absolutely no confidence in the way Ms. Wellman picked out photograph No. 1, also because of the length of time she took. I could understand the manner in which she was doing it with her hand; and when she said that the kid's face in photograph No. 1 was fatter than that of the suspect, I had absolutely no confidence in her at that time. I also received a laboratory report dated the 15th of November, 2000, stating that Joseph Seeber's fingerprints were not those on the latent fingerprint cards presented to the crime lab from the crime scene. Miss Loveall, I did have confidence in because she had observed the suspect under no stress whatsoever."

At that point, defense counsel objected on the basis that Atwell's answer was beyond the scope of the prosecutor's question. The trial court sustained the objection. Defense counsel did not move to strike Atwell's answer or ask the court to admonish the jury to disregard the answer.

The prosecutor then questioned Loveall about what factors led Atwell to place more import on Loveall's rejection of the first photo lineup:

"[Prosecutor:] Were there any factors that led you to place more import on Miss Loveall's rejection of that lineup than Ms. Wellman's identification of the lineup?
"[Atwell:] Yes, ma'am.
"[Prosecutor:] And what were those factors?
"[Atwell:] Because Miss Loveall saw the person that could be the suspect under no stress whatsoever and she also saw the suspect bare-faced; whereas Ms. Wellman was under a great deal of stress, and saw him with the bandana over the lower half [of] his face."

Defense counsel did not object to this line of testimony.

LaPointe contends that Atwell's testimony was clearly improper since he was passing on the credibility of Loveall, who was a critical witness for the State. It is well established that a witness may not express an opinion on the credibility of another witness. This is because the determination of the truthfulness of a witness is left to the jury. *State v. Elnicki*, 279 Kan. 47, 53, 105 P.3d 1222 (2005). Moreover, a witness may not express an opinion which would pass upon the credibility of another witness or upon the weight of disputed evidence. *State v. Giles*, 27 Kan. App. 2d 340, 347, 4 P.3d 630, *rev. denied* 269 Kan. 936 (2000). Although Atwell did not comment on the *truthfulness* of Loveall or Wellman during his testimony, he did give his opinion as to the reliability or credibility of disputed evidence, that is, their eyewitness identifications.

A reading of the trial transcript in this case reveals that during his testimony, Atwell acted as an expert witness when he gave his opinion on the credibility or reliability of the eyewitness identifications. This is clearly evidenced by the following testimony:

"[Prosecutor:] Have you had occasion in your 26 years in the Johnson County Sheriff's Office to show photo lineups to other victims and other witnesses of crimes?

"[Atwell:] Yes, ma'am.

"[Prosecutor:] On how many occasions, would you estimate?

"[Atwell:] I would probably say 200.

"[Prosecutor:] Based upon your experience with 200 or so photo lineups, is five minutes looking at a photographic array a long time, short time, or an average time?

"[Atwell:] It's a very long time."

Four pages later into his testimony, Atwell did not just comment on the eyewitness identifications, but he directly attacked Wellman's identification by discussing the following four factors that formed the basis of his opinion that her identification was unreliable: (1) the length of time Wellman took to make the identification; (2) her comment that the individual's face in the photograph was fatter than that of the robber; (3) the fact that she was under a great deal of stress when she saw the robber; and (4) the fact that she saw him with the bandana over the lower half of his face.

This testimony was improper because he was telling the jury that a good eyewitness would promptly pick a suspect from a photo lineup if the eyewitness was confident about the identification. Moreover, Atwell stressed that an eyewitness' observations under stress are less accurate than an eyewitness' observations under no stress. This form of testimony was improper whether Atwell was testifying as an expert or a lay witness.

Such testimony attacking the credibility or reliability of eyewitness identifications is inadmissible in Kansas. Our Supreme Court has consistently held that juries have the knowledge and experience to determine the reliability of an eyewitness identification. *State v. Corbett*, 281 Kan. 294, 306, 130 P.3d 1179 (2006); *State v. Gaines*, 260 Kan. 752, 762-63, 926 P.2d 641 (1996). 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence § 6:3, Comment b, pp. 175-76 (5th ed. 2007), explains that expert testimony regarding the unreliability of eyewitness identification is not admissible in criminal cases because it invades the province of the jury:

"Expert testimony offered to show eyewitness identification to be unreliable has met with little success in Kansas courts. It is considered an invasion into the area of common knowledge of jurors and hence there is no need for expert evidence. State v. Reed, 226 Kan. 519, 601 P.2d 1125 (1979). When eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the pretrial identification, a cautionary instruction should be given to the jury advising them of the factors to be considered in weighing credibility of the eyewitness identification testimony. State v. Warren, 230 Kan. 385, 635 P.2d 1236, 23 A.L.R.4th 1070 (1981). Also see, State v. Shepherd, 232 Kan. 614, 657 P.2d 1112 (1983)."

Thus, because the jury can decide the issue of the reliability of eyewitness identification using its common knowledge, expert testimony on the unreliability of eyewitness identifications should not be admitted at trial. *Gaines*, 260 Kan. at 755-63; see also *State v. Graham*, 246 Kan. 78, 785 P.2d 983 (1990) (neither the State nor the defendant is allowed to present expert testimony that invades the province of the jury).

Here, Atwell's testimony directly commented on the credibility or reliability of the eyewitnesses' identifications. Kansas courts have not allowed a witness to testify to the credibility of another, because

assessment of the credibility of witnesses is the sole province of the jury. See *State v. Elnicki*, 279 Kan. 47, 53-54, 105 P.3d 1222 (2005) (trial court has no discretion on whether to allow witness to express opinion on credibility of another witness; such evidence is inadmissible as a matter of law).

Yet, the State presented testimony from Atwell, the lead detective in the case who was highly experienced in administering photo lineups, that directly commented on the credibility or reliability of the eyewitnesses' identifications. Atwell testified, among other things, that he had absolutely no confidence in Wellman's identification of Seeber because of the length of time she took. Moreover, Atwell testified that he had the utmost confidence in Loveall's identification of LaPointe because she had observed him under no stress whatsoever. The testimony of Atwell as a law enforcement officer would be given more credit than other witnesses because of Atwell's official position and because his position may imply that his testimony was reliable.

Here, it is undisputed that the main issue at trial was the identity of the robber. No physical evidence was recovered linking LaPointe to the crime. The clerk at the Payless store (Wellman) had made an eyewitness identification of another target suspect (Seeber) in the case. The only evidence placing LaPointe at the scene of the crime was the testimony of Norton, who had a significant criminal history and was incarcerated for a federal bank robbery conviction at the time of LaPointe's trial, and the eyewitness identification of Loveall. When Loveall testified at trial and could not remember certain details about the robber or whether the car's headlights were illuminating the shadowy area in which she saw the robber on the night of October 30, 2000, Atwell's testimony about the reliability of Loveall's eyewitness identification of LaPointe over Wellman's eyewitness identification of Seeber became the crucial basis, if not the main basis, for LaPointe's conviction.

It is unclear why defense counsel failed to raise a proper objection to Atwell's testimony. This is because an evidentiary hearing was never conducted where defense counsel could explain his conduct. Moreover, the parties have not been given the opportunity to present witnesses on this issue. After reviewing LaPointe's

K.S.A. 60-1507 motion and the files and records of the case, we determine that a substantial issue was presented as to whether defense counsel was ineffective in failing to object to Atwell's testimony. As a result, we reverse and remand for an evidentiary hearing on this issue.

## B. Failure to File Notice of Alibi With Correct Address

Next, LaPointe contends that trial counsel's failure to place Loretta's correct address on the notice of alibi constituted ineffective assistance of counsel.

One week before trial, defense counsel filed a notice of intent to rely on an alibi defense and sent this notice to the prosecutor in the case. The notice stated that on October 30, 2000, LaPointe was at home with his wife, Loretta, at 1414 E. 2nd Street, Tonganoxie, Kansas 66086.

At trial, Loretta testified that LaPointe was at her house between 7:35 p.m. and 9:45 p.m. on October 30, 2000, and that LaPointe watched her children after she left for work at 9:45 p.m. During the prosecutor's cross-examination, Loretta testified that she had never lived at 1414 E. 2nd in Tonganoxie, Kansas. Loretta testified that she was living at 1125 South 86th in Kansas City, Kansas, on October 30, 2000.

After Loretta gave this testimony, the prosecutor argued outside of the presence of the jury that she had been misled by the notice of alibi. The prosecutor asserted that the owner of 1414 East 2nd Street in Tonganoxie was waiting to testify as the State's rebuttal witness that he had owned that property since 1998. The prosecutor argued that she had based her rebuttal work on the address in the notice of alibi and asked that Loretta's testimony be struck or that the jury be allowed to see the notice of alibi.

The trial court took a short break to allow defense counsel and the prosecutor to confer. Apparently, the parties agreed that the State would be allowed to introduce the notice of alibi into evidence "so the jury will know what the State relied on as to the address and allow full and open inquiry regarding the issue for the trier of fact."

On redirect examination, defense counsel elicited testimony from Loretta that she had never given him the Tonganoxie address:

"[Defense counsel:] And just to make clear for the record, Miss LaPointe, there was a Notice of Alibi Defense filed where my office had, as a matter of fact, typed in and provided [the prosecutor] with an address in Tonganoxie? You never resided at that address, did you?

"[Loretta:] No, I've never been at that address.

"[Defense counsel:] You certainly never personally gave me an address telling me that that was your address; is that right?

"[Loretta:] No, I did not."

Loretta then acknowledged that she had spoken with defense counsel frequently when he first entered the case but had basically stopped having contact with him around the first of the year.

After Loretta testified, defense counsel presented testimony from his secretary, Courtney Beck. Consistent with Loretta's testimony, Beck testified that after the first of the year, Loretta did not return phone calls and failed to respond to letters from defense counsel's office. Beck further testified that there was a concern that Loretta was not going to appear and testify. According to Beck, she keyed the phone number she had for Loretta into Google's lookup service and obtained the address that was later put in the notice of alibi. Beck testified that the telephone number she had for Loretta came from a private investigator, and she did not know how recent the number was. Beck was unsure whether the phone number was for a land-based phone or a cell phone, but she testified that it was her understanding that it was Loretta's home number based on what the private investigator had told her.

LaPointe argues that defense counsel's failure to make a reasonable investigation into ascertaining a correct address for his alibi undermined his alibi defense at trial and his only alibi witness, Loretta.

The duty of counsel to make reasonable investigations has been set forth in *State v. Hedges*, 269 Kan. 895, 914, 8 P.3d 1259 (2000), as follows:

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reason-

ableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [Citations omitted.]"

Part of the duty to make reasonable investigations includes the duty to investigate completely the details of a defendant's alibi. When a defendant "claims that he is innocent and was no where near the scene of the crime, it becomes necessary to investigate completely the details of his alibi." 1 Lane, Goldstein Trial Techniques § 4:45 Alibi, p. 4-187 (3d ed. 2007). Goldstein Trial Techniques § 4.45 Alibi, p. 4-187 sets forth several questions to aid in the investigation of alibi evidence:

"Where was [the defendant] at the time the alleged crime was committed? Was he there by previous appointment? *Who can verify his story? Get their full names and addresses.* Are the alibi witnesses friends or family? Is there any documentary corroboration? Does the alibi cover the entire time in question?" (Emphasis added.)

Here, Loretta's address was vitally important to LaPointe's alibi because that is where LaPointe claimed he was when the alleged robbery occurred on October 30, 2000. The trial court in this case aptly pointed out the magnitude of defense counsel's mistake in including an incorrect address in the notice of alibi. In looking at the notice of alibi, the trial court noted that the "logical conclusion that any person would jump to would be that Mr. LaPointe would know where his home is." The trial court further noted that it understood "there can be clerical errors and mistakes, but this is pretty monumental to the alibi defense and their preparation of their case. That's the reason the statute requires this to be written notice."

Indeed, it seems that defense counsel himself understood the magnitude of his mistake and how the jury could view this mistake when he apologized to the jury at the beginning of his closing argument:

"I want to apologize on behalf of my office for the alibi defense which was provided to me with an inaccurate address for Miss LaPointe. That was accidental and certainly inadvertent on my office's part, and again I apologize.

"Basically, we were having problems with Loretta cooperating with the things that were going on between she and Jack. All of [a] sudden she dropped off the

face of the earth, wouldn't return any phone calls or do anything. I wanted to make sure she was here to be able to testify."

In his appellate brief, LaPointe is asking this court to remand the case for an evidentiary hearing on his ineffective assistance of counsel claims. As with the previous issues, the parties have not been given the opportunity to present witnesses on this claim. Based on LaPointe's K.S.A. 60-1507 motion, along with the files and the records of the case, we determine that a substantial issue was presented as to whether LaPointe's trial counsel was deficient in including the wrong address on the notice of alibi.

## C. Failure to Request DNA Testing

Next, LaPointe argues that his trial counsel was ineffective in failing to request independent DNA testing of hairs found on a bandana and biological material on clothing allegedly worn by the robber.

Both this court and our Supreme Court have rejected a movant's argument that defense counsel was ineffective in failing to request or obtain DNA testing when defense counsel's decision not to request the testing was reasonable trial strategy. See *Moncla v. State*, 285 Kan. 826, 837-38, 176 P.3d 954 (2008); *Sanders v. State*, 26 Kan. App. 2d 826, 829, 995 P.2d 397 (1999).

Our Supreme Court in *Moncla* stated that trial counsel was not obligated to establish the identity of the murderer to effectively represent the defendant. Characterizing trial counsel's decision not to move the court for DNA testing as tactical, our Supreme Court stated:

"Some of the hair found at the scene belonged to the [murder victim]. So long as a question remained as to the source of the remaining hair and other substances found at the scene, Moncla's trial counsel was free to argue Moncla's theory that someone else committed the murder. That defense would have been compromised had DNA testing identified Moncla as the source of these items found at the scene. Thus, the decision not to move the court for testing may be reasonably characterized as 'a tactical decision and not a deficient one.' [Citations omitted.] We defer to decisions of trial counsel on matters of reasonable trial strategy." 285 Kan. at 837-38.

As a result, our Supreme Court determined that Moncla had failed to demonstrate that his trial counsel was deficient in failing to obtain DNA analysis. 285 Kan. at 837-38.

Similarly, this court in *Sanders* held that trial counsel's decision not to have DNA evidence independently tested to be tactical and not deficient:

"The fact is that independent testing *might*, as petitioner argues, have produced evidence in his favor; however, it also *might* have verified that the State's evidence was accurate. Defense counsel had shown the State's evidence to have some exploitable weaknesses which would disappear if another and independent test verified the original results. The decision not to have the DNA independently tested was a tactical decision and not a deficient one." 26 Kan. App. 2d at 829.

As a result, this court concluded that defense counsel was not ineffective. 26 Kan. App. 2d at 829.

Interestingly, in both *Moncla* and *Sanders*, the trial court summarily denied the movant's K.S.A. 60-1507 ineffective assistance of counsel claims. Although there was no testimony from defense counsel at an evidentiary hearing, our Supreme Court and this court were able to determine that defense counsel's actions were a matter of trial strategy. Nevertheless, the record in this case is not factually complete to decide the issue. In the absence of a complete record, trial courts are in the best position to gauge whether trial counsel acted for strategic reasons. *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986); see also *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (In a collateral proceeding, "counsel accused of deficient performance can explain their reasoning and actions, and the district court can render its opinion on the merits of the claim.").

Here, defense counsel's conduct in not requesting further testing and comparison of the hairs and clothing could have been a tactical decision and part of his trial strategy in defending LaPointe. Indeed, the trial judge recognized this possibility at the October 2007 hearing: "[T]he possibility is very real that counsel didn't want it tested at trial. And that if the outcome of the case is contrary to the defense, then there's no loss in wanting it tested after the fact." The trial judge noted, however, that an evidentiary hearing would need to be held "to delve into the reasonableness of [defense counsel]'s actions in not asking, requesting testing."

The trial court's observations were correct. While it seems very likely that defense counsel's actions were a matter of trial strategy,

any determination that defense counsel's actions were a part of his trial strategy would be pure speculation without defense counsel's testimony. In denying LaPointe's K.S.A. 60-1507 motion, the trial judge, who presided over both LaPointe's trial and his K.S.A. 60-1507 motion, never determined that defense counsel's actions in failing to request further DNA testing were a matter of trial strategy. Moreover, there are no findings by the trial court to support a conclusion that defense counsel's actions were trial strategy. That is because the record was never developed factually as to the basis for counsel's conduct.

In the absence of a complete record on this issue, we are unaware of defense counsel's reasons for not requesting further DNA testing. See *People v. Alvarado*, 256 A.D. 219, 683 N.Y.S.2d 501, 502 (1998) (ineffectiveness claim would require a collateral proceeding "since this claim is based on facts *dehors* the record and counsel has had no opportunity to explain his strategy"). The trial court acknowledged that an evidentiary hearing would need to be held in order to determine whether defense counsel's actions were trial strategy. Indeed, the reasons for defense counsel's decision to not request further DNA testing need to be developed factually so that appropriate findings can be made in this case. Without those findings, any determination as to defense counsel's reasons for not requesting further DNA testing would be speculation and not supported by substantial competent evidence in the record. See *State v. Gonzales*, 289 Kan. 351, 212 P.3d 215 (2009) (applying substantial competent evidence standard of review to trial court's finding as to defense counsel's decisions regarding whether to call certain individuals as defense witnesses).

Based on the record before this court, the appropriate resolution of the issue of whether defense counsel was ineffective in failing to request further DNA testing is to remand for an evidentiary hearing. We are already remanding the case for an evidentiary hearing on LaPointe's first two ineffective assistance of counsel claims, and this third claim will be included in the remand.

## D. Failure to Object to Prosecutorial Misconduct

Next, LaPointe contends that his trial counsel was ineffective in failing to object to prosecutorial misconduct. Nevertheless, a con-

temporaneous objection to alleged prosecutorial misconduct is not required to preserve the issue for appeal if the prosecutor's statements violated the defendant's right to a fair trial; an appellate court applies the same standard of review regardless of whether the defendant lodged an objection. *State v. Lumley*, 266 Kan. 939, 965, 976 P.2d 486 (1999). Even if defense counsel's performance was deficient in failing to object to prosecutorial misconduct at trial, LaPointe would not be able to establish the prejudice prong of the test for ineffective assistance of counsel on this issue. See *Duran v. State,* Case No. 96,178, unpublished opinion filed June 27, 2008, *rev. denied* 287 Kan. 765 (2009). LaPointe's claim would more properly be brought as a claim for ineffective assistance of appellate counsel for failure to raise the prosecutorial misconduct issue on direct appeal.

Moreover, defense counsel's failure to object did not preclude appellate review of the alleged prosecutorial misconduct on direct appeal. See *Weeks v. State*, Case No. 91,513, unpublished opinion filed January 21, 2005, *rev. denied* 279 Kan. 1010 (2005). LaPointe has not shown exceptional circumstances that prevented him from raising the prosecutorial misconduct issue on direct appeal, and he cannot now circumvent this requirement by simply alleging ineffective assistance of trial counsel. See Supreme Court Rule 183(c)(3) (2008 Kan. Ct. R. Annot. 248) (trial errors affecting constitutional rights may be raised in a K.S.A. 60-1507 motion, "provided there were exceptional circumstances excusing the failure to appeal").

## II. *Motion for Production of Hairs and Clothing for DNA Testing*

Next, LaPointe contends that the trial court abused its discretion in denying his motion requesting the production of hairs and clothing for DNA testing. LaPointe maintains that he was entitled to the production of the hairs and clothing for DNA testing under the Chapter 60 statutes governing discovery, specifically K.S.A. 60-234(a), and under the constitutional imperative in *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), giving him a due process right to access potentially exculpatory evidence.

Importantly, LaPointe never appealed his motion for DNA testing in his underlying criminal case. Therefore, any issue as to LaPointe's right to postconviction DNA testing in his underlying criminal case is not properly before this court. Instead, the issue before this court is limited to whether LaPointe was entitled to the production of hairs and clothing for DNA testing to prove his ineffective assistance of counsel claim in his K.S.A. 60-1507 motion.

LaPointe points out that the control of discovery is entrusted to the trial court's sound discretion, and discovery orders will not be disturbed on appeal in the absence of a clear abuse of this discretion. *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 704, 952 P.2d 1286 (1988). LaPointe's argument on this issue, however, requires the interpretation of statutory provisions and a determination of whether these provisions apply in a K.S.A. 60-1507 proceeding. Interpretation of a statute presents a question of law over which an appellate court's review is unlimited. *State v. Storey*, 286 Kan. 7, 9-10, 179 P.3d 1137 (2008). Moreover, LaPointe's argument also requires this court to determine whether his constitutional right to due process was violated. Whether an individual's due process rights were violated presents a question of law over which this court has de novo review. *Hearst v. State*, 30 Kan. App. 2d 1052, 1055-56, 54 P.3d 518 (2002).

### A. *Civil Discovery Statutes*

We first consider whether LaPointe was entitled to production of the hairs and clothing for DNA testing during discovery of his K.S.A. 60-1507 motion under the Kansas civil discovery statutes.

Supreme Court Rule 183(a) provides that a K.S.A. 60-1507 action is an independent civil action and that the procedure before the trial court and this court is governed by the Rules of Civil Procedure "insofar as applicable":

"K.S.A. 60-1507 is intended to provide in a sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in district courts in whose jurisdiction the prisoner was confined. A motion challenging the validity of a sentence is an independent civil action which should be separately docketed, and the procedure before the trial court and on appeal to the Court of Appeals is governed by the Rules of Civil Procedure insofar as applicable." (2008 Kan. Ct. R. Annot. 247).

Citing Rule 183(a) as authority, LaPointe contends that because K.S.A. 60-234 is a rule of civil procedure, it is applicable in the context of a K.S.A. 60-1507 proceeding. K.S.A. 60-234(a) provides in relevant part as follows:

"*Scope.* Any party may serve on any other party a request (1) . . . *to inspect and copy, test or sample any designated tangible things which constitute or contain matters with the scope of subsection (b) of K.S.A. 60-226 and amendments thereto and which are in the possession, custody or control of the party upon whom the request is served.*" (Emphasis added.)

LaPointe points out that the State has in its possession, custody, or control the five head hairs, the bandana, the cap, and the gloves recovered by law enforcement in the underlying criminal case and the DNA profile of Norton, which Norton was required to submit to the Kansas Bureau of Investigation under K.S.A. 21-2511(a). LaPointe maintains that because those items of physical evidence constitute matters within the scope of discovery outlined in K.S.A. 60-226(b), the State is required to produce them to him or to an independent DNA laboratory acting on behalf of him, for DNA testing.

LaPointe cites no Kansas case that has held that a defendant is entitled to discovery under K.S.A. 60-234(a) in a K.S.A. 60-1507 proceeding. Rather, to support his argument, LaPointe cites *Smith v. State*, 22 Kan. App. 2d 922, 924 P.2d 662 (1996), and *Hickson v. State*, 39 Kan. App. 2d 678, 182 P.3d 1269 (2008). In *Smith*, this court held that a K.S.A. 60-1507 motion may be voluntarily dismissed under K.S.A. 60-241(a)(1). In *Hickson*, this court looked to K.S.A. 60-203, which provides that a civil action is commenced at the time of filing a petition with the district court, in determining that the appellant had never properly commenced his K.S.A. 60-1507 proceeding. Neither of those cases are helpful here because they did not deal with the application of the civil discovery statutes to K.S.A. 60-1507 proceedings.

Recently, in *Moll v. State*, 41 Kan. App. 2d 677, 204 P.3d 659 (2009), this court rejected an argument that civil discovery rules apply to a K.S.A. 60-1507 proceeding. There, the State argued that the trial court improperly overruled the State's objections to Moll's expert witnesses and allowed the witnesses to testify, even though

Moll had not provided notice to the State under K.S.A. 60-226(b)(6).

In addressing the State's argument in *Moll*, this court noted that our Supreme Court in *Pabst v. State*, 287 Kan. 1, 192 P.3d 630 (2008), has acknowledged that aspects of the Code of Civil Procedure are not necessarily applicable to K.S.A. 60-1507 proceedings. In *Pabst*, our Supreme Court considered whether relation-back provisions contained in the Code of Civil Procedure were applicable in a K.S.A. 60-1507 proceeding. Our Supreme Court initially noted that the Rules of Civil Procedure govern K.S.A. 60-1507 proceedings " 'insofar as applicable' " 287 Kan. at 23 (quoting Supreme Court Rule 183[a]). Our Supreme Court reasoned that K.S.A. 60-1507 motions required specificity in alleging the factual and legal bases for the claims being made. As a result, when an additional motion raised allegations that differed in the factual basis from a claim alleged in the original K.S.A. 60-1507 motion, the allegations did not relate back to the original motion. 287 Kan. at 25; *Moll*, 41 Kan. App. 2d at 688.

Similarly, this court in *Moll* determined that the expert disclosure requirements of K.S.A. 60-226(b) were not applicable in a K.S.A. 60-1507 proceeding. This court reasoned that the discovery provisions of K.S.A. 60-226 are designed to define the factual and legal arguments in a civil proceeding initiated by notice pleading. This court noted that in the context of notice pleading cases, the discovery rules are designed to prevent a party from surprising an opposing party at trial. 41 Kan. App. 2d at 688-89.

Pointing out that the procedure for the disposition of K.S.A. 60-1507 motions does not specifically authorize extensive discovery, this court stated:

"[T]he procedure authorized for the disposition of a motion under K.S.A. 60-1507 does not specifically authorize extensive discovery. Under the specific pleading requirements of K.S.A 60-1507, the policy rationale behind the discovery rules is diminished. In a motion under K.S.A. 60-1507, a prisoner is required to allege the grounds for relief with factual and legal specificity. See *Pabst*, 287 Kan. at 25. As a result, the State should be able to determine the factual and legal nature of the movant's claim from the motion without resort to discovery. Significantly, none of the other discovery provisions of K.S.A. 60-226 were followed in this case." *Moll*, 41 Kan. App. 2d at 689.

Further pointing out that the United States Supreme Court has noted that the federal habeas petitioner is not entitled to discovery as a matter of ordinary course, this court stated:

"We note that our conclusion is consistent with federal practice. In discussing federal habeas corpus proceedings under 28 U.S.C. § 2254 (1994) (Rule 6a), the United States Supreme Court noted: 'A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.' *Bracy v. Gramley*, 520 U.S. 899, 904, 138 L. Ed. 2d 97, 117 S. Ct. 1793 (1997). The *Bracy* Court then noted that Congress under the direction of the Supreme Court had adopted rules governing federal habeas corpus that created a limited right to discovery. 520 U.S. at 904. In contrast, neither the Kansas Legislature nor the Kansas Supreme Court has adopted a rule similar to the rule discussed in *Bracy*." 41 Kan. App. 2d at 689.

Accordingly, this court held that the discovery rules of K.S.A. 60-226(b)(6) were not applicable in a K.S.A. 60-1507 proceeding. 41 Kan. App. 2d at 689.

Similar to the discovery rules of K.S.A. 60-226 discussed in *Moll*, the discovery rules of K.S.A. 60-234 are not applicable in a K.S.A. 60-1507 proceeding. The liberal discovery procedures in the Code of Civil Procedure are set up for discovery in an ordinary civil case where a party can be sanctioned for abusing the discovery process. The procedures and sanctions do not transfer readily to a K.S.A. 60-1507 proceeding where monetary sanctions can often not be collected from an imprisoned movant. In K.S.A. 60-1507 proceedings, the threat of monetary sanctions would not serve as an adequate check on the abuses of the discovery process as they do in an ordinary civil case.

Further, the purpose of discovery in an ordinary civil case is different from the purpose of a K.S.A. 60-1507 proceeding. The purpose of the discovery rules in the Code of Civil Procedure is to " 'educate the parties in advance of trial of the real value of the claims and defenses; to expedite litigation; to safeguard against surprise; to prevent delay; to simplify and narrow the issues; and to expedite and facilitate both preparation and trial. [Citation omitted.]' [Citation omitted.]" *U.S.D. No. 232 v. CWD Investments*, 288 Kan. 536, 566, 205 P.3d 1245 (2009). Discovery is used to

determine the facts that are relevant to the issues in controversy. *Jones v. Bordman*, 243 Kan. 444, 454, 759 P.2d 953 (1988).

On the other hand, the movant in a K.S.A. 60-1507 proceeding is required to have this information already in the motion. Specifically, a K.S.A. 60-1507 movant is required to set forth in the motion " 'a factual background, names of witnesses or other sources of evidence to demonstrate that petitioner is entitled to relief.' [Citation omitted.]" *Swenson v. State*, 284 Kan. 648, 656, 162 P.3d 808 (2007). In order to avoid summary denial of the K.S.A. 60-1507 motion, the movant must show a substantial issue from the motion, files, and records in the case. See *Bellamy v. State*, 285 Kan. 346, 353, 172 P.3d 10 (2007). This is because the movant's claims in a K.S.A. 60-1507 motion are based on what occurred in the underlying criminal case, where a record has already been developed.

As pointed out in *Moll*, the procedure authorized for the disposition of K.S.A. 60-1507 motions does not specifically authorize extensive discovery. We hold that the discovery rules of K.S.A. 60-234(a) are not applicable in a K.S.A. 60-1507 proceeding.

## B. Due Process Right to Obtain Exculpatory Evidence

LaPointe next argues that he has a due process right under the Fourteenth Amendment to the United States Constitution to have access to potentially exculpatory evidence under the authority of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

The State contends that LaPointe has raised this constitutional argument for the first time on appeal. The State then cites the familiar rule that where a constitutional issue has not been raised before the trial court, it will not be considered for the first time on appeal. *State v. Kaesontae*, 260 Kan. 386, Syl. ¶ 2, 920 P.2d 959 (1996). Nevertheless, LaPointe correctly points out that he did ask the trial court for production of the hairs and clothing for DNA testing under *Brady*. As a result, his constitutional argument is properly before this court on appeal.

Since LaPointe filed his brief in this case, the United States Supreme Court issued its decision in *District Attorney's Office for*

*the Third Judicial District, et al. v. Osborne,* 556 U.S. ___, 174 L. Ed. 2d 38, 129 S. Ct. 2308 (June 18, 2009), where it held that Osborne had no constitutional right to obtain postconviction access to the State's evidence for DNA testing. Osborne had brought an action under 42 U.S.C. §1983, claiming that he had a due process right to access the evidence used against him at his criminal trial, where he had been convicted of sexual assault, kidnapping, and assault, in order to subject it to DNA testing at his own expense.

The *Osborne* Court determined that *Brady,* which held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial, was the wrong framework to apply to a proceeding for postconviction relief:

> "A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But 'once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears.' *Herrera v. Collins,* 506 U.S. 390, 399 (1993). 'Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.' [Citation omitted.]
>
> "The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. '[W]hen a State chooses to offer help to those seeking relief from convictions,' due process does not 'dictat[e] the exact form such assistance must assume.' [Citation omitted.] Osborne's right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* is the wrong framework." 129 S. Ct. 2320.

The United States Supreme Court then defined the question as follows:

> "Instead, the question is whether consideration of Osborne's claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.' [Citations omitted.] Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." 129 S. Ct. at 2320.

In considering this question, the United States Supreme Court found nothing inadequate about the procedures that Alaska, the state where Osborne was convicted, had provided to vindicate its

state right to postconviction relief in general and nothing inadequate about how those procedures applied to those who sought access to DNA evidence. Pointing out that Alaska provided procedures similar to those provided for DNA evidence by federal law, the United States Supreme Court stated:

"Alaska provides a substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence. It exempts such claims from otherwise applicable time limits. The State provides for discovery in postconviction proceedings, and has — through judicial decision — specified that this discovery procedure is available to those seeking access to DNA evidence. [Citation omitted.] These procedures are not without limits. The evidence must indeed be newly available to qualify under Alaska's statute, must have been diligently pursued, and must also be sufficiently material. These procedures are similar to those provided for DNA evidence by federal law and the law of other States, see, *e.g.*, 18 U.S.C. § 3600(a), and they are not inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.' [Citation omitted.]" 129 S. Ct. 2320.

The United States Supreme Court further noted that the Alaska Court of Appeals had suggested that the Alaska Constitution provided an additional right of access to DNA. 129 S. Ct. at 2321.

Thus, under *Osborne*, the question to be asked in cases where the defendant seeks to obtain DNA evidence is whether consideration of the defendant's claim within the framework of Kansas' procedures for postconviction relief " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.' [Citation omitted.]" 129 S. Ct. at 2320.

Here, the trial court suggested that if LaPointe was able to prove that his counsel was ineffective in failing to request additional DNA testing, it would reconsider the question of DNA testing to allow LaPointe to show prejudice as a result of trial counsel's failure to conduct those tests. The trial court ruled, however, that LaPointe must first show that defense counsel was deficient in not requesting certain DNA testing before trial.

Explaining that a defendant who makes a tactical decision to forego DNA testing at trial should not be allowed to obtain post-

conviction DNA testing, Justice Alito, in his concurring opinion in *Osborne*, stated:

"When a criminal defendant, for tactical purposes, passes up the opportunity for DNA testing at trial, that defendant, in my judgment, has no constitutional right to demand to perform DNA testing after conviction. Recognition of such a right would allow defendants to play games with the criminal justice system. A guilty defendant could forgo DNA testing at trial for fear that the results would confirm his guilt, and in the hope that the other evidence would be insufficient to persuade the jury to find him guilty. Then, after conviction, with nothing to lose, the defendant could demand DNA testing in the hope that some happy accident — for example, degradation or contamination of the evidence — would provide the basis for seeking postconviction relief. Denying the opportunity for such an attempt to game the criminal justice system should not shock the conscience of the Court." 129 S. Ct. at 2329. (Alito, J., concurring.)

Although *Osborne* was a §1983 action brought by the defendant, Justice Alito pointed out that the Alaska court, in a previous case, had rejected Osborne's claim that his attorney was ineffective in failing to seek more restrictive DNA testing. Justice Alito stated that Osborne had not challenged the holding in the previous case and that the United States Supreme Court must therefore proceed on the assumption that Osborne's decision was reasonable and binding. 129 S. Ct. at 2329. (Alito, J., concurring.)

Here, the trial court was correct in its ruling that LaPointe must first establish that his counsel's performance was deficient. LaPointe is seeking production of the hairs and clothing for DNA testing to prove his ineffective assistance of counsel claim. The DNA testing bears only on the prejudice prong of the test for ineffective assistance of counsel. Thus, the DNA testing becomes relevant only if LaPointe is able to show that his counsel was deficient in not requesting the additional DNA testing. If the failure of defense counsel to request the DNA testing was a matter of trial strategy and not deficient conduct, LaPointe's ineffective assistance of counsel claim fails. As a result, the case should be remanded for an evidentiary hearing as to whether LaPointe's trial counsel was ineffective in failing to request the DNA testing.

This approach is consistent with the Pennsylvania Supreme Court's decision in *Com. v. Williams*, 587 Pa. 304, 899 A.2d 1060 (2006). There, the appellant argued that he should be able to obtain

postconviction DNA testing to prove the prejudice prong of his ineffective assistance of counsel claim. The Pennsylvania Supreme Court held that appellant first needed to establish that his counsel lacked a reasonable basis for not pursuing DNA testing before the prejudice prong would be resolved. The court remanded the case for an evidentiary hearing on whether defense counsel lacked a reasonable basis for not pursuing DNA testing. 587 Pa. at 314.

Similarly, we remand the case for an evidentiary hearing as to whether defense counsel's conduct in failing to pursue further testing of the hairs and clothing was deficient. Until LaPointe has established that his counsel was deficient, the issue as to whether LaPointe should be allowed to obtain the hairs and clothing for DNA testing is not properly before this court.

*Applicability of K.S.A. 21-2512*

In its appellate brief, the State seems to suggest that K.S.A. 21-2512(a) is the statute that governs all postconviction DNA testing. K.S.A. 21-2512 allows for postconviction DNA testing under certain circumstances for those defendants who have been convicted of rape or murder. In *State v. Denney*, 278 Kan. 643, 101 P.3d 1257 (2004), our Supreme Court extended the provisions of K.S.A. 21-2512 on equal protection grounds to allow a defendant who had been convicted of aggravated criminal sodomy to petition the district court for forensic DNA testing.

Recently, in *State v. Salas*, 289 Kan. 245, 210 P.3d 635 (2009), our Supreme Court rejected the argument that K.S.A. 21-2512 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it allows postconviction DNA testing of evidence if a defendant is convicted of premeditated first-degree murder but does not allow such testing if the defendant is convicted of intentional second-degree murder.

Outside of the equal protection arguments presented in *Denney* and *Salas*, our Supreme Court has not been presented with the issue of whether K.S.A. 21-2512 should be extended to defendants who have been convicted of crimes other than rape, murder, or aggravated criminal sodomy. It should be pointed out that before setting out the procedure for requesting DNA testing, K.S.A. 21-

2512(a), begins by stating: "Notwithstanding any other provision of law . . . ." There appears to be no Kansas cases in which this court or our Supreme Court have addressed to what extent criminal defendants who do not come within K.S.A. 21-2512 can obtain DNA testing to prove their ineffective assistance of counsel claims.

Nevertheless, as discussed previously, LaPointe's case is not currently in the proper procedural posture to determine whether he is entitled to DNA testing to prove his ineffective assistance of counsel claim. The production of hairs and clothing for DNA testing comes into play only if LaPointe is able to show that his trial counsel's conduct in not requesting additional DNA testing was deficient. If LaPointe establishes that his counsel was deficient in failing to request DNA testing, then the trial court needs to consider whether LaPointe is entitled to the production of hairs and clothing for DNA testing.

Affirmed in part, reversed in part, and remanded for an evidentiary hearing.

\* \* \*

MALONE, J., concurring: I concur with the result reached by the majority that this case should be remanded for an evidentiary hearing on Jack R. LaPointe's claim of ineffective assistance of counsel. However, I disagree with much of the reasoning expressed in the majority opinion.

I agree with the majority that LaPointe is entitled to an evidentiary hearing on the claim that his trial counsel was ineffective in the handling of the alibi witness, Loretta LaPointe. The initial error of listing the wrong address on the alibi notice was probably not that serious and could have been easily explained to the jury as a clerical error by counsel's staff. However, defense counsel compounded the problem by having his secretary testify there was a concern that Loretta was not going to appear at trial. In closing argument, defense counsel emphasized there was a problem with Loretta cooperating in the case. This must have undermined the credibility of Loretta's alibi testimony, which was crucial to LaPointe's defense.

As to trial counsel's failure to object to Detective Scott Atwell's testimony about the unreliability of Carrie Wellman's photo lineup identification, this testimony was offered to explain why Atwell focused his investigation on LaPointe rather than on Joseph Seeber. At trial, Wellman acknowledged that she was unsure of her pick in the photo lineup. Atwell was not expressing an opinion on the credibility of another witness. Furthermore, he was not testifying at trial as an expert witness on eyewitness identification.

As to trial counsel's failure to request DNA testing, the State had no physical evidence linking LaPointe to the robbery and assault. The State's testing of the hairs and clothing, as well as testing of the fingerprints recovered from the Payless store, did not implicate LaPointe as the robber. In fact, the hairs found on the bandana and clothing did not match the hairs collected from LaPointe and "the most likely outcome" was that they were not LaPointe's hairs. With that evidence, defense counsel was free to argue LaPointe's theory that someone else committed the robbery. In fact, defense counsel emphasized during closing argument that there was no fingerprint or hair match or DNA evidence placing LaPointe at the Payless store on the night of October 30, 2000.

If defense counsel had requested further testing and comparison of the hairs and clothing, it might have shown that the hairs and any other DNA evidence that could have been recovered did not belong to other possible suspects in the case such as Seeber or Michael Norton. Worse yet, further testing of the hairs and any DNA evidence recovered from the clothing could have implicated LaPointe. Both of these outcomes would have seriously weakened, if not destroyed, defense counsel's argument that someone else committed the robbery. As a result, defense counsel's decision not to have the hair and clothing evidence submitted for further testing can be characterized as a reasonable tactical decision and not a deficient one. Because defense counsel's performance in not requesting DNA testing was not deficient, there is no need to address LaPointe's claim that the district court erred in denying his motion for further DNA testing after the K.S.A. 60-1507 motion was filed.