**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JACK R. LaPOINTE,

Petitioner - Appellant,

v.

JOHN OLIVER, Warden, USP Florence-High; DEREK SCHMIDT, Attorney General of the State of Kansas,

Respondents - Appellees.

No. 19-3258
(D.C. No. 5:14-CV-03161-JWB)
(D. Kansas)

**ORDER DENYING**
**CERTIFICATE OF APPEALABILITY**[*]

Before **BRISCOE**, **KELLY,** and **McHUGH**, Circuit Judges.

Petitioner Jack R. LaPointe, a prisoner in Kansas state custody, seeks a Certificate of Appealability ("COA") to challenge the district court's dismissal of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. A jury convicted Mr. LaPointe of aggravated battery and aggravated assault for robbing a shoe store. His § 2254 petition alleges that he received ineffective assistance in violation of his Sixth Amendment right to counsel. We decline to grant a COA and dismiss this matter.

---

[*]This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and 10th Circuit Rule 32.1.

## I. BACKGROUND[1]

### A. Factual History

Mr. LaPointe did not provide a transcript of the proceedings in the trial court. We therefore rely on the opinion of the Kansas Court of Appeals for its summary of the evidence presented at Mr. LaPointe's trial. *See* 28 U.S.C. § 2254(e)(1) (state court's factual findings are "presumed to be correct"); App. at 59 ("Here, Petitioner does not challenge the state court's findings."). The Kansas Court of Appeals described the facts as follows:

#### The Robbery

> Around 8 p.m. on October 30, 2000, Carrie Wellman was checking out customers at the Payless store when a man walked in with a gun and proceeded to rob the store. Monica Ortiz was shopping in the Payless store with her three children and was completing her purchase when the robber walked in the store. The robber pointed the gun in Ortiz' face and instructed her not to look at him. The robber also pushed Ortiz' 5–year–old daughter to the ground when she tried to run to her mother. After Wellman gave the robber approximately $1,000 in a plastic shopping bag, he ran from the store. Wellman then called the police.
>
> Carrie Delaney and Brandy Loveall had been shopping at a store in the strip mall and were driving out of the parking lot when Loveall spotted a man carrying a gun and walking fast on the sidewalk. Loveall made eye contact with the man before he passed her and ran between two buildings. According to Loveall, Delaney was driving the car when Loveall saw the man.

---

[1] Mr. LaPointe's appendix does not include his § 2254 petition, respondent's answer, or transcripts from his jury trial. Per 10th Cir. R. 10.4(D)(2), "[w]hen the appeal is from an order disposing of a motion or other pleading, the motion . . . and other supporting documents . . . , filed in connection with that motion or pleading, and any responses and replies . . . must be included in the record or appendix." We exercise our discretion to retrieve the § 2254 petition and respondent's answer from the district court's docket, though we are under no obligation to do so. *See* 10th Cir. R. 10.4(B).

When the police arrived at the scene, several officers went to a nearby apartment complex after learning that the robbery suspect had been seen there. Upon arriving at the apartment complex, Officer Eric Thompson saw a woman in the parking lot holding cash in her hand. The woman told Thompson that a Caucasian man had just run through the breezeway and had dropped the money on his way up the stairs. Thompson took the money, which was $138, from the woman and asked her to remain there. Thompson ran through the breezeway to look for the robber but was unable to find him. When Thompson returned to his patrol car, the woman was no longer there.

During their search of the apartment complex area, officers found a plaid shirt and hat in a breezeway and a pair of cloth gloves in the front of one of the buildings. In addition, a police dog that had been brought to the apartment complex to track the suspect's scent pulled a blue and white bandana from underneath a car parked at the complex.

### Eyewitnesses' Description of Suspect

Detective Karen Borstelman interviewed Loveall on November 1, 2000, and completed a composite sketch of the man she saw carrying a gun on the evening of October 30, 2000. Loveall described the man as Caucasian and standing approximately 6 feet tall, wearing a blue and white bandana on his head, with blond hair sticking out from underneath the bandana. The man was wearing a blue and white flannel shirt and was carrying a double-barreled sawed-off shotgun. Loveall further described the man as being in his early 30's and having a slender build. By the time of trial, Loveall had forgotten some of the details she had given Borstelman and described the man she saw as Caucasian and wearing a bandana on his head, wearing a coat, and carrying a gun. Moreover, Loveall could not recall whether the headlights of Delaney's car were illuminating the shadowy area in which the man was walking. Nevertheless, at trial, Loveall identified LaPointe as the man she had seen on the evening of October 30, 2000.

The other witnesses' descriptions of the robber differed somewhat from Loveall's description. According to Wellman, the man was Caucasian, was in his mid- to late–20's, stood about 6 feet tall, wore a plaid jacket and a bandana over part of his face, and had blond spikey hair with dark roots. Ortiz described the robber as a Caucasian man who was in his mid–20's and of slender build. Ortiz testified that the robber was wearing a cap and had put a handkerchief over his face when he came into the store. Ortiz' 11–year–old daughter, Monserrat Santos, described the robber as a

Caucasian man with blue eyes and a muscular build. According to Santos, the robber had blond spikey hair, stood about 6 feet tall, had placed a bandana over his nose and mouth shortly after he had entered the store, and had not been wearing a hat.

Delaney was also interviewed by a detective and gave a description of the man, but she was unable to make a composite sketch. Delaney described the man as Caucasian and standing 5'10" tall, having a skinny build, wearing nothing on his head, wearing a blue flannel-type shirt, and carrying a white plastic trash bag. Delaney did not see the man carrying a weapon. According to Delaney, she was shown a photo lineup but was unable to make a positive identification. Delaney testified that she had suffered a stroke, which had affected her short-term memory, during the first part of October 2000.

During the investigation of the robbery, one of the officers had commented that an individual named Joseph Seeber seemed to match the suspect's description and lived in the apartment complex just north of the Payless store. A photo lineup was then put together with Seeber's picture.

*Wellman's Eyewitness Identification*

On November 9, 2000, Detective Scott Atwell showed Wellman the photo lineup. In looking at the photographs, Wellman used her hand to cover up the lower half of each of the faces. After approximately 5 minutes, Wellman identified the suspect in photograph number 1 as the robber. Nevertheless, according to Atwell, Wellman indicated that the person depicted in photograph 1 had a fatter face and longer hair than the robber. At trial, Wellman acknowledged that she was unsure of her pick in the photo lineup. Moreover, Wellman testified that she would not recognize the man who robbed her if she saw him again. The person in photograph 1 was Seeber, the target suspect in that photographic lineup.

*Loveall's Failure to Identify Suspect in First Lineup*

On November 15, 2000, Atwell showed the same photo lineup to Loveall. Nevertheless, Loveall immediately stated that all the individuals in the photos were "way too young."

*Atwell's Testimony Concerning Eyewitness Identifications*

Despite Wellman's identification of Seeber in the photo lineup, the police did not attempt to contact Seeber to question him about the robbery.

4

When questioned at trial about why he had not investigated Seeber further, Atwell testified that he had "absolutely no confidence in the way" Wellman picked out photograph 1. Moreover, Atwell explained that he had received a laboratory report stating that Seeber's fingerprints were not those on the latent fingerprint cards collected at the Payless store. Atwell acknowledged, however, that the latent prints did not match LaPointe's fingerprints either. Atwell further testified that he had confidence in Loveall's identification "because she had observed the suspect under no stress whatsoever" and had seen the suspect bare-faced.

### Norton's Interviews With FBI Agents

During November 2000, Michael Norton was taken into FBI custody on suspicion of bank robbery. During his interview, Norton told FBI agents that he had been told by LaPointe that LaPointe had robbed the Payless store in Roeland Park. Norton stated that he believed that LaPointe had used a shotgun during the robbery and had thrown the shotgun on the roof of a nearby building after the robbery.

After Norton pled guilty to federal bank robbery charges, FBI agents interviewed Norton on January 4, 2001, regarding the Payless robbery. During that interview, Norton admitted that he had been involved with LaPointe in the Payless robbery. Norton stated that he had driven LaPointe to the Payless store and had parked at a nearby apartment complex while LaPointe went to commit the robbery using a shotgun. Norton told the FBI agents that when LaPointe had returned to the car, LaPointe said that he had thrown the shotgun onto the roof of the Fashion Bug, which was a store in the same strip mall as the Payless store.

### Recovery of Sawed-off Shotgun

Based on this information, FBI Agent Jeffrey Harris contacted Atwell and then met him in the parking lot of the Fashion Bug. With the fire department's help, a 12–gauge sawed-off shotgun was recovered from the roof of the Fashion Bug.

### Loveall's Identification of LaPointe in Second Photo Lineup

On January 22, 2001, Atwell showed Loveall a second photo lineup with LaPointe's picture in it. According to Atwell, as soon as the photo lineup hit Loveall's hand, she pointed to photo 4 and said "that's the guy." LaPointe was the individual in photograph 4. The ages of the other

individuals depicted in the photo lineup were 21, 21, 20, 19, and 25, while LaPointe was 31. This second photo lineup was never shown to Wellman.

## *LaPointe's Trial*

LaPointe went to trial on charges of one count of aggravated robbery and one count of aggravated assault. The State's main evidence against LaPointe at trial was Loveall's identification of LaPointe and Norton's statements and testimony that LaPointe had committed the robbery. Although Norton implicated himself in the Payless robbery during his testimony at trial, he had been given immunity in exchange for his testimony against LaPointe. Norton had not received any reduction in his federal sentence for his cooperation in LaPointe's criminal case.

## *Norton's Testimony*

During his testimony at trial, Norton stated that he and LaPointe had known each other since 1998. Moreover, both Norton and LaPointe had worked for Norton's father during 2000.

According to Norton, on October 30, 2000, he and LaPointe had planned to do a robbery in a low-key area that had a quick get-away to the highway. Norton testified that he was supposed to get 3/4 of the money that LaPointe got from the robbery because LaPointe owed him money. Once LaPointe decided to rob the Payless store, Norton pulled into the parking lot behind the Fashion Bug to wait for LaPointe.

Norton testified that he brought a sawed-off shotgun that he had obtained from LaPointe. Norton further testified that when LaPointe got out of the car, he took the shotgun and placed it up the sleeve of his sweater. According to Norton, LaPointe was wearing jeans, a pull-over sweater, a ball cap, and a bandana when he got out of the car.

Norton testified that LaPointe came running to the car approximately 15 to 20 minutes later without the gun. LaPointe told Norton that there was a Hispanic woman in the store that was trying to leave, but he had forced her back and told her that no one was leaving. According to Norton, he heard a thump before he saw LaPointe and assumed that LaPointe had probably thrown the gun in a dumpster or on the roof of a building. When LaPointe returned to the car, he told Norton that he had thrown the gun on the roof of the building.

According to Norton, he dropped LaPointe off at the home of LaPointe's girlfriend, Deanna Burch, about 45 minutes after the robbery. Norton testified that Burch's car was parked outside when he dropped off LaPointe. Nevertheless, Burch testified that she was working at an event at Wal–Mart on October 30, 2000, and did not get home until around 9:30 that night. According to Burch, LaPointe did not have a key to her home, and he was not there when she got home that evening. Norton testified that he later disposed of LaPointe's bandana and gloves in a dumpster at his apartment complex. Norton testified that he has been bald on top of his head since he was 20, and his hair is brown but turns semi-blond with a lot of sunlight. During his testimony at trial, Norton admitted that he had 10 prior convictions for dishonesty or false statement. His criminal history included several convictions for armed robbery and auto theft, which dated back to when he was a juvenile.

### Seeber's Testimony

The State called Seeber as a witness at trial. Seeber testified that he was not the individual who had robbed the Payless store with a sawed-off shotgun. Seeber further testified that he did not have a car and did not know Norton or LaPointe. At the time of trial, Seeber was 22 years old, 5'9", and 170 pounds.

### Loretta LaPointe's Testimony

Loretta LaPointe, who married Jack LaPointe on March 15, 2001, testified that she had seen LaPointe pull a sawed-off shotgun out of the trunk of her car around the beginning of October 2000. Loretta immediately told LaPointe that the gun was not staying there, and she never saw it again. LaPointe told Loretta that he had gotten the shotgun from one of their friends to compensate Norton for a pistol that Loretta had thrown in the river after she had found it in her car.

### Forensic Evidence

Lila Thompson, a latent print examiner, testified that she was unable to develop any latent prints on the gun that was found on the roof of the Fashion Bug store. Thompson was able to find latent fingerprints on the latent print cards recovered from the Payless store. Thompson compared these latent fingerprints against Seeber's fingerprints, but they did not match. Another latent fingerprint examiner compared the fingerprints on three of the latent print cards with the fingerprints of LaPointe and Norton, but they did not match. He also tested the money recovered from the

woman at the apartment complex for fingerprints, but no prints of sufficient value for comparison purposes were obtained.

Sally Lane, a forensic chemist at the Johnson County crime lab, examined the shirt, cap, gloves, and bandana recovered from the apartment complex for DNA evidence. Lane found two hairs on the bandana and additional hairs on the shirt, cap, and gloves. Lane sent the hairs to the Kansas City, Missouri, police crime lab. Lane attempted to obtain additional DNA evidence from the items submitted to her, but she was unable to obtain a sufficient DNA sample.

Robert Booth, the chief criminalist at the Kansas City, Missouri, police crime lab, examined four head hairs and microscopically compared them against LaPointe's hair. Booth compared the hairs with 34 of LaPointe's hairs, which were taken from the top, sides, and front of his head. Booth testified that none of the four head hairs matched LaPointe. According to Booth, his comparison testing did not definitively establish that the head hairs did not come from LaPointe because he had only a representative sample of LaPointe's hair or because LaPointe could have changed his hair since the hairs were deposited. Nevertheless, Booth testified that those two explanations were "rather remote in occurrence" and that the explanation that the hairs were not LaPointe's was "the most likely outcome." Booth did not compare the hairs to any from Seeber or Norton.

### Alibi Evidence

LaPointe's alibi presented at trial was that he had been at the home of Loretta LaPointe, his girlfriend and later his wife, on the evening of October 30, 2000. According to LaPointe, he had broken up with Burch by that time and was living with Loretta. Loretta testified that on October 30, 2000, she received a call from work at 7:35 p.m. that she needed to report for the night shift that evening. According to Loretta, she left her home around 9:45 p.m. to work the 10:30 p.m. shift. Loretta testified that she remembered LaPointe being home that evening and eating Halloween candy with her daughter. Loretta further testified that LaPointe was at home from the time she received the call at 7:35 p.m. until she left for work and that he also babysat her children while she was at work.

The State presented rebuttal evidence from Detective Atwell that when he went to Loretta's home on December 18, 2003, she never told him that LaPointe was at home on October 30, 2000. According to Atwell, he served Loretta with a subpoena on March 18, 2004, and asked her then where LaPointe was on the day of the robbery. At that time, Loretta told

Atwell that LaPointe had been at home on October 30, 2000, eating Halloween candy with her daughter while she was preparing for work.

### LaPointe's Testimony

LaPointe testified that he did not see Norton on October 30, 2000, and he did not go to the Payless store. LaPointe further testified that he did not commit the armed robbery and aggravated assault. According to LaPointe, he weighed approximately 240 pounds in October 2000 and was 6 feet tall. During Loretta's testimony, a picture was admitted that was taken of LaPointe around October 28, 2000, which showed him having short dark brown hair.

*LaPointe v. State*, 214 P.3d 684, 688–92 (Kan. Ct. App. 2009).

## B. Procedural History

A jury convicted Mr. LaPointe of aggravated robbery and aggravated assault. A judge then sentenced Mr. LaPointe to a 245-month term of imprisonment, to run consecutively to his sentences in three other cases.

The Kansas Court of Appeals affirmed. *State v. LaPointe*, No. 93,709, 2006 WL 2936496 (Kan. Ct. App. Oct. 13, 2006). The Kansas Supreme Court denied review on February 14, 2007.

Mr. LaPointe then filed a motion in state trial court for post-conviction relief under Kan. Stat. Ann. § 60-1507. In that motion, Mr. LaPointe asserted seven reasons his trial counsel was ineffective:

(1) failing to request independent DNA testing of hairs found on a bandana and biological material on clothing allegedly worn by the robber; (2) failing to object when Detective Atwell improperly bolstered the identification of LaPointe by Loveall; (3) failing to object when Atwell testified he had no confidence in Wellman's eyewitness identification of Seeber as the perpetrator of the robbery; (4) placing an incorrect address on the notice of alibi, which allowed the State to impeach LaPointe's alibi; (5) failing to object to improper comments by the prosecutor in closing argument; (6)

9

> failing to thoroughly investigate the case and interview witnesses; and (7) failing to effectively cross-examine and impeach the State's witnesses.

*LaPointe*, 214 P.3d at 692. Mr. LaPointe also requested "production of the five head hairs and the clothing recovered by officers" for DNA testing. *Id.* at 692–93. On November 7, 2007, the state trial court denied that motion. *LaPointe v. State*, No. 07 CV 5853, 2007 WL 7758195 (Kan. Dist. Ct. Nov. 7, 2007).

The Kansas Court of Appeals affirmed in part, reversed in part, and remanded for an evidentiary hearing on three of Mr. LaPointe's ineffective assistance theories. *LaPointe*, 214 P.3d at 688. First, that defense counsel failed to object to Detective Atwell's testimony as to the credibility of the eyewitnesses. *Id.* at 696. Second, that defense counsel included an incorrect address in the notice of alibi. *Id.* at 698. And third, that defense counsel failed to request independent DNA testing. *Id.* at 699. The Kansas Supreme Court denied review of the State's petition and Mr. LaPointe's cross-petition on September 9, 2010.

On remand, the state trial court held an evidentiary hearing and again denied Mr. LaPointe's motion. The Kansas Court of Appeals affirmed. *LaPointe v. State*, No. 106,492, 2012 WL 4372995 (Kan. Ct. App. Sept. 21, 2012). The court first held it was not ineffective for Mr. LaPointe's lawyer not to object to Detective Atwell's testimony, because "the testimony was elicited to explain the course of the investigation and to address the defense contention that Atwell conducted a shoddy investigation." *Id.* at *7. Next, the court held Mr. LaPointe was not prejudiced by the error in the notice of alibi, because the jury was adequately apprised of the situation when defense counsel "admitted

10

the error." *Id.* at \*10. Finally, the court held it was not ineffective for Mr. LaPointe's lawyer not to request independent DNA testing, because the decision "was part of his trial strategy." *Id.* at 11. The court further rejected Mr. LaPointe's assertion that his attorney had a conflict of interest solely because the attorney believed Mr. LaPointe was guilty. *Id.* The Kansas Supreme Court denied review on October 1, 2013.

On February 27, 2014, Mr. LaPointe filed a petition for DNA testing of the hairs found at the crime scene under Kan. Stat. Ann. § 21-2512. The state trial court ordered DNA testing that ultimately "confirmed one hair did not belong to [Mr.] LaPointe, while the other was inconclusive but probably not his." *State v. LaPointe*, 434 P.3d 850, 853 (Kan. 2019).

On September 2, 2014, Mr. LaPointe filed a § 2254 petition in the United States District Court for the District of Kansas, naming Warden John Oliver and Kansas Attorney General Derek Schmidt as respondents.[2] The § 2254 petition raised three theories of ineffective assistance: (1) defense counsel should have requested independent DNA testing of the hairs recovered near the crime scene; (2) defense counsel listed an incorrect address in the notice of alibi; and (3) defense counsel failed to object when Detective Atwell vouched for the credibility of eyewitnesses.

---

[2] Respondents pointed out in their answer that Mr. LaPointe may no longer be housed at the United States Penitentiary in Florence, Colorado, and that he is therefore no longer supervised by Warden John Oliver. Rather than amend the caption in this order, we use the term "respondents" to refer to Mr. LaPointe's current warden and to Kansas Attorney General Derek Schmidt. *Cf.* Fed. R. App. P. 43(c)(2) (explaining that "any misnomer that does not affect the substantial rights of the parties may be disregarded").

11

On April 1, 2015, despite the DNA test results, the state trial court denied Mr. LaPointe's request for a new trial.

On June 30, 2015, the district court issued an order to show cause why Mr. LaPointe's § 2254 petition should not be dismissed as a mixed petition. Mr. LaPointe responded by requesting a stay.

On July 30, 2015, the district court stayed Mr. LaPointe's § 2254 petition "to allow [Mr. LaPointe] to complete exhaustion in the Kansas appellate courts of his claim based upon exculpatory post-conviction DNA results." App. at 7.

Mr. LaPointe appealed the state trial court's denial of his motion for a new trial. The Kansas Court of Appeals affirmed because "it is clear that [Mr.] LaPointe was not convicted based on physical evidence." *State v. LaPointe*, No. 113,580, 2016 WL 6910200, at *4 (Kan. Ct. App. Nov. 23, 2016). Consequently, the court found he could not show "there was a reasonable probability a jury would have reached a different outcome had it considered the [DNA] test results." *Id.* at *5.

The Kansas Supreme Court affirmed. *LaPointe*, 434 P.3d at 858–59. The court cited Robert Booth's testimony "that the fact the hair did not belong to [Mr.] LaPointe did not mean he did not wear the clothing." *Id.* at 859. Moreover, the "jury heard testimony explaining why hair not belonging to [Mr.] LaPointe could be on the clothing and why his DNA might not be found there." *Id.* And, apart from the forensic evidence, "key details to Norton's testimony were corroborated by the recovered gun from the Fashion Bug roof based on his tip; testimony from [Mr.] LaPointe's wife and

12

[Mr.] LaPointe confirming details about the sawed-off shotgun and the debt-repayment arrangement; and the eyewitness identification." *Id.*

On March 22, 2019, the district court lifted its stay of Mr. LaPointe's § 2254 petition and ordered respondents to submit an answer. Respondents filed their answer on August 1, 2019.

On September 16, 2019, Mr. LaPointe filed a traverse[3] to respondent's answer. Respondents moved to strike Mr. LaPointe's traverse for raising additional issues and arguments not included in the § 2254 petition.

On October 31, 2019, the district court granted in part and denied in part respondent's motion to strike Mr. LaPointe's traverse and denied Mr. LaPointe's § 2254 petition. The district court struck only the portion of Mr. LaPointe's traverse raising a "new claim of cumulative error." App. at 67.

Turning to the merits of Mr. LaPointe's § 2254 petition, the district court first determined that Mr. LaPointe had not shown defense counsel was ineffective due to a conflict of interest. Even though defense counsel believed Mr. LaPointe was guilty, "[t]here is no evidence . . . that trial counsel had an interest in the outcome of the trial that was in conflict with [Mr. LaPointe's] interest." App. at 72. Moreover, defense counsel "zealously defended" Mr. LaPointe at trial. App. at 73.

The district court then found that defense counsel's decision not to request independent DNA testing did not constitute ineffective assistance. Defense counsel made

---

[3] A traverse is a "formal denial of a factual allegation made in the opposing party's pleading." Black's Law Dictionary (11th ed. 2019).

13

a strategic decision not to request additional testing because he was "concerned that the testing could harm, rather than help," Mr. LaPointe's defense. App. at 73.

The district court next addressed Mr. LaPointe's notice of alibi claim, which it summarized as follows:

> The record shows that trial counsel was required to file a pre-trial notice of alibi in order to rely on the defense at trial. [Defense counsel] filed a notice of alibi that stated that Petitioner was at an address in Tonganoxie, Kansas, at the time of the crime. The problem with the notice of alibi was that Loretta [LaPointe] (and Petitioner) had never resided at that address in Tonganoxie. They were living together at the time of the crime at an address in Kansas City, Kansas. Loretta testified that she had lived at the Kansas City address for eight years. [Defense counsel's] secretary had obtained the Tonganoxie address by using the internet to search for an address that was connected to Loretta's phone number.
>
> At trial, the incorrect address came up during the prosecutor's cross examination of Loretta. After a conference outside the presence of the jury, the court allowed the notice of alibi to be offered into evidence. Loretta testified that Petitioner was at home on the night of the crime. Loretta testified that she was called into work that evening and the Petitioner watched her children while she went to work. Besides identifying that the Tonganoxie address was incorrect, the prosecutor did not spend much time questioning Loretta about the notice of alibi. On re-direct, [defense counsel] questioned Loretta about the Tonganoxie address to which Loretta agreed that she had never provided the Tonganoxie address to [defense counsel's] office. [Defense counsel] then questioned Loretta about her cooperativeness and Loretta agreed that she was not as cooperative with [defense counsel] in the few months prior to trial. [Defense counsel] then called his secretary, Courtney Beck, to testify how she obtained the address from the internet. During closing argument, [defense counsel] apologized to the jury for the mistake in the notice. [Defense counsel] again stated that there were things going on between Loretta and Petitioner and he wanted to make sure that she was at trial. He also brought up the cooperation problems. At the evidentiary hearing, [defense counsel] testified that he did not recall asking Petitioner if the address was correct. He further testified that he did not believe that he attacked Loretta's credibility but that it could have enhanced her "credibility because it's showing she had, quite frankly, had changed sides and wasn't certain which side she would be on and came into court and testified to the best of her ability."

14

App. at 75–76 (citations omitted).

The district court found that defense counsel's entry of an incorrect address on the pre-trial notice of alibi was not prejudicial because "the jury knew that the incorrect address was the result of a mistake made by [defense counsel] and not due to the witness." App. at 79.

Lastly, the district court found defense counsel's failure to object to Detective Atwell's testimony as to the credibility of the eyewitnesses was not ineffective assistance. The district court reasoned that when Detective Atwell testified to his confidence in Ms. Loveall's identification of Mr. LaPointe, and lack of confidence in Ms. Wellman's identification of Mr. Seeber, he was explaining to the jury "why he took the direction he did in the investigation." App. at 85.

The district court additionally found that Mr. LaPointe was not prejudiced by Detective Atwell's testimony because (1) his testimony was consistent with that of the eyewitnesses, and (2) even without Detective Atwell's testimony, the jury would likely have reached the same verdict based on the testimony of Ms. Wellman, Ms. Loveall, Mr. Norton, and Loretta LaPointe.

On November 12, 2019, the district court declined to issue a COA. Mr. LaPointe timely filed a notice of appeal on November 27, 2019, followed by a formal request for a COA.

## II.  ANALYSIS

In his application for a COA, Mr. LaPointe makes four arguments: (1) defense counsel's failure to request independent DNA testing was based on a personal conflict of interest; (2) defense counsel provided ineffective assistance by failing to request independent DNA testing; (3) defense counsel provided ineffective assistance by putting the wrong address in the notice of alibi; and (4) defense counsel provided ineffective assistance by failing to object to Detective Atwell's testimony as to the credibility of the eyewitnesses. We first set forth our multi-layered standard of review before addressing each of these arguments in turn.

### A.  Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). "Instead, [a] petitioner must first seek and obtain a COA." *Id.* To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

"At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

16

encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (quoting *Miller–El*, 537 U.S. at 327). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Id.* (quoting *Miller–El*, 537 U.S. at 336).

## B. Attorney Conflict of Interest

"The Sixth Amendment's guarantee of the right to counsel includes the right to representation that is free from conflicts of interest." *United States v. Williamson*, 859 F.3d 843, 851 (10th Cir. 2017) (internal quotation marks omitted). "An actual conflict can support an ineffective assistance of counsel claim where the conflict prejudiced the defendant's representation." *Id.* at 852. "Generally, a defendant must demonstrate prejudice flowing from the conflict, but in some circumstances, a court will presume prejudice when the conflict amounts to the complete denial of counsel." *Id.*

"So far, the Supreme Court has applied the 'presumed prejudice' rule only for conflicts of interest in multiple representation cases." *Id.* We assume without deciding that the Supreme Court's presumed prejudice cases apply outside the multiple representation context, and that Mr. LaPointe may consequently invoke a presumption of prejudice if "an actual conflict adversely affected his representation." *Id.* at 853.

As the district court found, however, Mr. LaPointe has not identified a conflict of interest. Defense counsel's private belief in Mr. LaPointe's guilt does not amount to a

conflict of interest.[4] For a conflict to exist, "the interests of counsel and defendant must be divergent in the current litigation, such that the attorney has an interest in the outcome of the particular case at issue that is adverse to that of the defendant." *Hale v. Gibson*, 227 F.3d 1298, 1313 (10th Cir. 2000). Mr. LaPointe does not identify any adverse interest. As a result, we do not presume prejudice and our normal test for ineffective assistance of counsel applies to Mr. LaPointe's conflict of interest claim. *See Williamson*, 859 F.3d at 853.

## C. *Ineffective Assistance of Counsel & § 2254(d)*

"A defendant making an ineffective-assistance-of-counsel claim must show both that counsel's performance 'fell below an objective standard of reasonableness' and that 'the deficient performance prejudiced the defense.'" *Barkell v. Crouse*, 468 F.3d 684, 689 (10th Cir. 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "To be deficient, the performance must be 'outside the wide range of professionally competent assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 690). "As for the prejudice prong, the defendant must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted).

"When a state court has adjudicated a claim on the merits, a petitioner may obtain federal habeas relief only if the decision was 'contrary to, or involved an unreasonable

---

[4] Defense counsel did not express his private belief in Mr. LaPointe's guilt until the evidentiary hearing that took place in conjunction with Mr. LaPointe's petition for state post-conviction relief.

18

application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Jackson v. Warrior*, 805 F.3d 940, 945 (10th Cir. 2015) (quoting 28 U.S.C. § 2254(d)(1)-(2)). "Given that the standards of review under both *Strickland* and [28 U.S.C. § 2254] are 'highly deferential,' habeas review of ineffective assistance claims is 'doubly so.'" *Id.* at 954 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). "We defer both to counsel's strategic decisions about how best to represent his client and to the state court's determination that counsel's performance was not deficient." *Id.* "We grant relief only where a state court disposition 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington*, 562 U.S. at 103).

As a result, Mr. LaPointe is entitled to a COA on this claim only if, considering that doubly deferential standard, jurists of reason could disagree with the district court's resolution of his *Strickland* claim or "conclude the issues [he has] presented are adequate to deserve encouragement to proceed further." *Buck*, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 327). For the reasons we now explain, Mr. LaPointe cannot meet that threshold.

## 1. Defense counsel's failure to request independent DNA testing.

We address Mr. LaPointe's first two arguments together because both involve defense counsel's failure to request independent DNA testing of the hairs found near the crime scene. We assume without deciding that defense counsel was ineffective in failing

19

to request independent DNA testing, but nevertheless decline to issue a COA because reasonable jurists could not debate whether the failure to request a DNA test was prejudicial.[5]

Mr. LaPointe has not advanced a debatable argument that there is a reasonable probability DNA testing would have changed the jury's verdict. The case against Mr. LaPointe was not based, even in part, on inculpatory forensic evidence. To the contrary, the prosecution's forensic analysts each testified to the absence of any link between Mr. LaPointe's fingerprints, DNA, or hair and the crime scene. *LaPointe*, 214 P.3d at 691. Robert Booth, the prosecution's hair analyst, told the jury "the explanation that the hairs were not LaPointe's was 'the most likely outcome.'" *Id.* at 691–92. He also told the jury that Mr. LaPointe could have changed his hair after the hairs were deposited, but that such an explanation was "rather remote in occurrence." *Id.* at 691 (internal quotation marks omitted). Any DNA test showing that the hairs recovered from the crime scene were not Mr. LaPointe's hairs would merely have confirmed Robert Booth's uncontradicted testimony.

Our decision in *LaFevers v. Gibson*, 182 F.3d 705 (10th Cir. 1999), is instructive. There, we reviewed a habeas petition brought by a capital defendant convicted of first-degree murder. The defendant and another individual kidnapped an eighty-four-year-old

---

[5] The Kansas Court of Appeals determined that defense counsel's decision not to request independent DNA testing was not ineffective because it amounted to a "tactical" or "strategic" decision. *LaPointe v. State*, No. 106,492, 2012 WL 4372995, at *12 (Kan. Ct. App. Sept. 21, 2012). Because we focus our analysis on *Strickland*'s prejudice prong, we express no view on the Kansas Court of Appeals' analysis on this point.

woman, drove her to a secluded area, raped her, doused her in gasoline, and set her on fire. *Id.* at 709. The defendant argued his state appellate counsel was ineffective for failing to request a DNA test of blood recovered from the crime scene. *Id.* at 722. We rejected the claim "because even favorable DNA test results would not make a difference in this case." *Id.*; *see also Thompson v. Milyard*, 444 F. App'x 249, 253 (10th Cir. 2011) (unpublished) (declining to issue a COA on an ineffective assistance claim based on a failure to request DNA testing due to "the prosecution's scant reliance on the DNA evidence and the plethora of other evidence").

**2. The incorrect address in the notice of alibi.**

Mr. LaPointe's third argument is that defense counsel provided ineffective assistance by entering an incorrect address in the notice of alibi, which was later brought to the attention of the jury. We again assume defense counsel was ineffective, but nevertheless decline to issue a COA because reasonable jurists could not debate whether counsel's error was prejudicial.

The Kansas Court of Appeals determined that Mr. LaPointe had not shown prejudice because defense counsel "admitted the error" to the jury. *LaPointe*, 2012 WL 4372995, at *10. We agree.

After the incorrect address on the notice of alibi came up at trial, defense counsel devoted substantial time to explaining the error so that it would not undermine Mr. LaPointe's defense. Defense counsel questioned Loretta LaPointe about the address mix-

21

up. Then he asked his secretary to explain how she obtained the incorrect address from the internet. Finally, defense counsel apologized to the jury for his mistake.

Mr. LaPointe argues defense counsel's error was prejudicial because it might have led the jury to doubt whether Mr. LaPointe had ever communicated his correct address to defense counsel, thereby casting doubt on the veracity of Mr. LaPointe's alibi. We agree with the district court that any confusion on this point was remedied by defense counsel's thorough explanation of the situation.

Because the prosecution spent very little time focused on the notice of alibi, and because defense counsel explained that the incorrect address was the product of, essentially, a clerical error, we conclude it is not debatable whether there is a reasonable probability a notice of alibi with the correct address would have changed the verdict.

Contrast the facts in this case with those at issue in *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006), *amended* (Feb. 15, 2007). There, the court found ineffective assistance because defense counsel submitted a notice of alibi that contained only one of three possible alibi witnesses. *Id.* at 359. Counsel's error was prejudicial because "Petitioner's entire defense strategy was an alibi defense." *Id.* at 360. "The jury had no idea that [the two omitted witnesses'] failure to testify was caused by the state trial court's exclusion, as opposed to [their] unwillingness or inability to corroborate" the alibi. *Id.* Dissimilarly, here the defense fully informed the jury about the error in the notice of alibi, and the error did not prevent any alibi witness from testifying.

Mr. LaPointe cites *Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005), a case that reviewed an ineffective assistance claim based on defense counsel having elicited "an

22

alibi only for the night after the night of the crime." *Id.* at 64. The court found prejudice because "the only evidence" connecting the defendant to the crime was one person's identification, contradicted by the alibi. *Id.* at 66. Here, the incorrect address on the notice of alibi was only tangentially related to the evidence, and there is no indication it affected the verdict.

Mr. LaPointe also argues the Kansas Court of Appeals issued conflicting opinions on this question, one before the evidentiary hearing and one after. As the district court explained, however, the first Kansas Court of Appeals decision merely addressed whether an evidentiary hearing was required, whereas the second decision "reviewed the entire record." App. at 78; *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (explaining that we look "to the last related state-court decision that does provide a relevant rationale"). We see no conflict.

### 3. Defense counsel's failure to object to Detective Atwell's testimony.

Mr. LaPointe's fourth argument is that defense counsel was ineffective for failing to object to Detective Atwell's testimony as to the credibility of the eyewitnesses. Reasonable jurists could not debate whether Mr. LaPointe has shown that the Kansas Court of Appeals unreasonably applied Supreme Court precedent in rejecting this ineffective assistance theory. We therefore decline to issue a COA and do not reach the question of prejudice.

To reiterate, in response to a question about why he did not investigate Mr. Seeber, Detective Atwell testified that he had "absolutely no confidence" in Ms. Wellman's identification of Mr. Seeber but did have confidence in Ms. Loveall's

identification of Mr. LaPointe "because she had observed the suspect under no stress whatsoever." *LaPointe*, 214 P.3d at 689–90 (internal quotation marks omitted). According to the district court, defense counsel objected to the last portion of Detective Atwell's testimony as "beyond the scope of the question," App. at 83 n.3, a detail Mr. LaPointe does not acknowledge in his application for a COA. Moreover, the trial court sustained that objection.

The Kansas Court of Appeals determined that defense counsel was not ineffective because Detective Atwell's "testimony was elicited to explain the course of the investigation and to address the defense contention that Atwell conducted a shoddy investigation." *LaPointe*, 2012 WL 4372995, at *7. The court also determined that Mr. LaPointe had not shown prejudice because "the jury received a proper instruction on the factors to consider in evaluating eyewitness testimony." *Id.*

The district court agreed with the Kansas Court of Appeals on both *Strickland* prongs. First, the district court found that defense counsel was not ineffective because Detective Atwell "was testifying as to why he took the direction he did in the investigation." App. at 85. Second, the district court found there was no prejudice, because Detective Atwell's testimony was "consistent with" the testimony of the eyewitnesses. App. at 86. Moreover, the district court reasoned that the jury instructions, which stated "that it was up to the jury to determine the weight and credit [sic] of the testimony of each witness," mitigated any risk of prejudicial error. App. at 87.

Before we address the substance of Mr. LaPointe's argument, we make two preliminary observations. First, the Kansas Court of Appeals described the rule "that a

24

witness may not express an opinion concerning the credibility of another witness" as "a correct principle of law." *LaPointe*, 2012 WL 4372995, at \*7 (citing *Bledsoe v. State*, 150 P.3d 868, 882 (Kan. 2007)). We are bound by that description. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (holding that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus").

Second, Mr. LaPointe "has not cited any published case that holds vouching testimony itself violates the Due Process Clause." *Parker v. Scott*, 394 F.3d 1302, 1310 (10th Cir. 2005). Consequently, the standard set forth at 28 U.S.C. § 2254(d) means Mr. LaPointe may not rely on our vouching cases to establish an unreasonable application of Supreme Court precedent. *See id.* (citing *Hellums v. Williams*, 16 F. App'x 905, 911 (10th Cir. 2001) (unpublished)). He may, however, assert an unreasonable application of *Strickland*. *See id.* at 1320–21. And to assess whether counsel performed deficiently under the first prong of *Strickland,* we must necessarily consider the merit of the objection counsel failed to make. *See id.* at 1321 (evaluating defense counsel's failure to object to vouching testimony "under Oklahoma precedent" that interpreted "the Oklahoma rules of evidence").

Reasonable jurists could not debate whether the Kansas Court of Appeals unreasonably applied *Strickland*. When Detective Atwell testified that he lacked confidence in Ms. Wellman's identification of Mr. Seeber, he was responding to a question about why he did not pursue an investigation of Mr. Seeber as a suspect. In context, it is clear Detective Atwell was recounting his impressions of Ms. Wellman at the time of the photo identification, and not expressing an opinion on her trial testimony.

25

Therefore, we agree with the Kansas Court of Appeals that Detective Atwell's "testimony was elicited to explain the course of the investigation and to address the defense contention that Atwell conducted a shoddy investigation." *LaPointe*, 2012 WL 4372995, at *7.[6]

Detective Atwell's further testimony, that he believed Ms. Loveall's identification of Mr. LaPointe, presents a closer call. After all, Detective Atwell expressed an opinion as to the credibility of Ms. Loveall's identification seemingly based only on his second-hand assessment of the circumstances surrounding her identification. *See LaPointe*, 214 P.3d at 690 (asserting that "she had observed the suspect under no stress whatsoever").

There might have been room for "fairminded disagreement," *Harrington*, 562 U.S. at 103, whether Detective Atwell's statement was admissible under the Kansas Supreme Court's decision in *Bledsoe*. There, a sheriff interviewed a suspect about his daughter's disappearance. 150 P.3d at 875. The suspect responded, "She's dead isn't she? Do you know if she's dead?" *Id.* At trial, the sheriff testified that these statements were "unusual" because "most people put them thoughts out of their mind." *Id.* The Kansas Supreme Court held it was not ineffective assistance for defense counsel not to object to the sheriff's "admissible testimony." *Id.* at 882. The sheriff's testimony was admissible

---

[6] Mr. LaPointe argues that, at the time of Detective Atwell's testimony, the defense had not (yet) accused the Detective of conducting a shoddy investigation. But defense counsel's failure to object must be evaluated "in light of all the circumstances," *Strickland*, 466 U.S. at 690, which in this case include defense counsel's reference to Mr. Seeber in his opening statement. *See LaPointe*, 2012 WL 4372995, at *5 (quoting defense counsel's opening statement: "Mr. [Seeber] was not investigated as part of this case and has never been charged in this case and has never been subject to examination regarding this case." (alteration in original)).

26

because it "helped to explain the course of the investigation" and "was rationally based on the sheriff's perception." *Id.* Alternatively, the sheriff's testimony was admissible as expert testimony because "it was based on data known to him and on his experience as a longtime law enforcement officer." *Id.*

But because Mr. La Pointe failed to provide trial transcripts, we know only that Detective Atwell expressed "confidence" in Ms. Loveall's identification of Mr. LaPointe. *LaPointe*, 214 P.3d at 690; *see also LaPointe*, 2012 WL 4372995, at *6. Without more information, it is uncertain whether Detective Atwell's testimony was admissible under *Bledsoe*, either as lay or expert testimony. This ambiguity cuts against Mr. LaPointe because he bears the burden to show that he is entitled to a COA. *See Miller-El*, 537 U.S. at 348 (referring to the petitioner's "burden").[7]

Under these circumstances, it is not debatable whether the Kansas Court of Appeals applied *Strickland* erroneously, "beyond any possibility for fairminded disagreement," in determining that defense counsel's performance did not fall outside the wide range of professional competence. *Harrington*, 562 U.S. at 103. We therefore deny a COA on this claim.

---

[7] Mr. LaPointe also argues that—other than Ms. Loveall's identification—the state presented a "weak evidentiary case." LaPointe Br. at 26. This observation, right or wrong, is beside the point for purposes of this order because Mr. LaPointe has not asked us to review the sufficiency of the evidence.

### III.    CONCLUSION

Because reasonable jurists could not debate whether Mr. LaPointe is entitled to relief, we **DENY** his request for a COA and **DISMISS** the matter.

Entered for the Court


Carolyn B. McHugh
Circuit Judge